18-2974(L)
*In re: M/V MSC Flaminia*

MENASHI, *Circuit Judge*, concurring in part and dissenting in part:

I join Parts I, II, IV, and V of the court's opinion. For the reasons the court states, the district court erred when it decided that Deltech and Stolt could be held strictly liable under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note.[1] But the district court did not err when it held that Deltech and Stolt were negligent under COGSA on a failure-to-warn theory or when it held that Conti, NSB, and NOT were not negligent for those entities' respective actions.

I disagree with the court about three issues. First, the district court erred in holding that MSC was not negligent. Second, the district court erred when it concluded that Stolt's breach-of-contract claim against BDP is not actionable because BDP did not cause any harm to Stolt. Third, MSC is not entitled to full indemnification from Deltech and Stolt.

I

The district court concluded that MSC was not negligent at all. That was erroneous. Even if Deltech and Stolt had duties to provide additional warnings and failed to discharge those duties, MSC received information concerning the stowage of DVB-80 but failed to heed those warnings. The instructions for the Master Bill of Lading ("MBLI") explained that the DVB-80 was to be stowed away from heat sources. *In re M/V MSC Flaminia*, 339 F. Supp. 3d 185, 204 n.25 (S.D.N.Y. 2018) ("The Master Bill of Lading Instructions provided the following heat warning: 'DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING.'") There is no doubt that

---

[1] Unless otherwise noted, I use the same abbreviations as the opinion of the court.

MSC received those instructions; it relied on the instructions to generate the Sea Waybills. Had MSC complied with the instructions, the DVB-80 might not have autopolymerized and exploded. That is because, in addition to the early filling of the tanks and the tanks' stowage at the NOT dock, the district court identified two factors that "substantially contributed" to the autopolymerization: "[t]he placement of [the tanks] in Hold 4, where it was stored next to the containers of heated DPA and near the ship's heated fuel tanks" and the "hotter-than-typical ambient temperatures in Hold 4." *Id.* at 192 (quoting *In re M/V MSC Flaminia*, No. 12-CV-8892, 2018 WL 526549, at *30-31 (S.D.N.Y. Jan. 23, 2018)). The DVB-80 would not have been exposed to those conditions had MSC heeded the warnings provided in the MBLI.

In concluding that MSC's failure to heed the warnings contained in the MBLI was not negligent, the district court focused almost entirely on the method by which Stolt communicated information about the proper stowage of DVB-80. The district court identified "the DGD as the locus of critical information and warnings about the dangers of goods" and concluded that "Stolt's DGDs were defective." *Id.* at 238. It is correct that the DGDs were defective, but the district court's emphasis on those documents was misplaced. "COGSA does not require a shipper to use any particular method … to inform a carrier of the dangerous properties of its cargo." *Chem One, Ltd. v. M/V Rickmers Genoa*, 502 F. App'x 66, 71 (2d Cir. 2012). The district court even acknowledged that "other shippers and NVOCCs had included handling instructions on bills of lading or other non-DGD documents," *Flaminia*, 339 F. Supp. 3d at 219, indicating that maritime custom does not make it reasonable to rely solely on the DGDs. *See The Innocenta*, 13 F. Cas. 64, 65 (S.D.N.Y. 1879) ("[T]o make a custom of the port, the rule must be so generally known and

2

acknowledged and acted upon, as virtually to be applied by the whole of that part of the business community which it would affect."). Because neither COGSA nor maritime custom permits a carrier to ignore information other than that contained in the DGDs, MSC was not entitled to disregard the warning because it was not presented on a particular form. I would reverse the district court's decision that MSC was not negligent.

The court responds that, "even if MSC should have relied on the MBLI, MSC did not receive it until after the DVB-80 was loaded into tanks and after the tanks had already sat stagnant in the sun at New Orleans Terminal for four days, at which point it was far too late to alter existing stowage plans." *Ante* at 35. The court concludes that the MBLI's warnings were "functionally useless absent concurrent instructions forbidding shipment when the carrier could not adhere to the instructions." *Id.* But MSC received the MBLI on June 25—days before "MSC develop[ed] its stowage plan for the cargo aboard the Flaminia" on June 28 and well before the Flaminia even arrived at NOT to receive the cargo on June 30. *Flaminia*, 339 F. Supp. 3d at 204. The loading was not complete until July 1. *Id.*

In another part of its opinion, the court holds that Stolt failed to provide MSC with "material information about the DVB-80 tanks," specifically that "the tanks of DVB-80 onboard the Flaminia had been delivered early to New Orleans Terminal and sat there day after day, exposed to the sun." *Ante* at 28. If that holding is correct—and I believe it is—then it means that MSC could have acted to prevent risks even after the DVB-80 was loaded into tanks and sat out in the sun. MSC could have, for example, monitored the temperature of the DVB-80 or stowed it away from heat sources—as the MBLI directed.

Even if MSC could not have changed its stowage plan in response to the MBLI—despite the fact that the stowage plan had not yet been developed—MSC could have contacted Stolt or Deltech to determine the risks of failing to follow the heat warning. Because MSC did not do anything to heed the heat warning it received from the shipper, I would hold that it was negligent.

On remand, the district court would need to determine whether and to what extent MSC's breach of its duty of care gives rise to liability. Assuming the resultant damage flowed directly from MSC's breach and was within the scope of the risk of MSC's negligent act, *see In re Kinsman Transit Co.*, 338 F.2d 708, 724 (2d Cir. 1964) (Friendly, J.) ("The weight of authority in this country rejects the limitation of damages to consequences foreseeable at the time of the negligent conduct when the consequences are 'direct,' and the damages, although other and greater than expectable, is of the same general sort that was risked."), the district court would need to apportion fault between Deltech, Stolt, and MSC in the first instance. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980) (noting that "[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve" except "where only one conclusion may be drawn from the established facts"). I would remand for the district court to make that determination.

## II

The district court erred when it concluded that Stolt's breach-of-contract claim against BDP was not actionable because the breach did not cause harm. BDP's breach did in fact harm Stolt because, had the Sea Waybills contained terms requiring the stowage of DVB-80

4

away from heat sources, MSC's conduct in this case—its stowing of the DVB-80 near heat and its lack of temperature monitoring—would have constituted a contractual breach of the Sea Waybills. MSC's contractual breach would render it liable to Stolt for its lack of proper stowage, and the other terms of the Sea Waybills—including the indemnity provision—could not be invoked against Stolt and Deltech after MSC's breach. *See U.W. Marx, Inc. v. Koko Contracting, Inc.*, 124 A.D.3d 1121, 1122 (N.Y. App. Div. 3d Dep't 2015) (explaining that one party's "prior material breach" relieves the other party of its duty to "perform[] its remaining obligations under the contract").

BDP argues that MSC would never have agreed to include such a provision in the Sea Waybills. That argument fails for several reasons. First, there is evidence that MSC had previously permitted stowage instructions to be included in sea waybills. In early June 2012 Deltech shipped a container of DVB-80 on the MSC Marianna. The sea waybill issued for that shipment contained the exact warning at issue in this case: "DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING." Exs. 5346-47. The same warning appeared on a sea waybill issued by MSC to Deltech in February 2012 for a shipment of DVB-63. *See* Ex. 5351. Second, the relevant comparator for causation-of-damages purposes is the state of affairs in which BDP *had* performed its duties; it was BDP's obligation to *secure* Sea Waybills with the appropriate stowage instructions, and doing so would have altered MSC's legal obligations. Third, even if BDP's obligation was solely to seek—rather than to *secure*—the inclusion of Deltech's stowage instructions in the Sea Waybills, the proper and adequate performance of BDP's duties required it to inform Stolt of MSC's refusal to accept the stowage conditions. *See Flaminia*, 339 F. Supp. 3d at 242 (noting that "[p]roper and adequate performance" of BDP's "document processing duties" was "implicit

5

in [its] agreement" with Stolt). Such notice could have either prevented the voyage altogether or prompted renewed negotiation between MSC and Stolt regarding the conditions of stowage.

In any event, the district court's conclusion was based on the premise that MSC would not have "had different legal responsibilities" if the stowage instructions had been contained in the Sea Waybills. *Id.* at 243. Because that premise is incorrect, I would reverse on this issue.

## III

The district court concluded that the terms of the Sea Waybills required Deltech and Stolt to indemnify MSC, Conti, and NSB for the losses those entities sustained. That was erroneous because the Sea Waybills' indemnification provision is partially unenforceable under the Harter Act, 46 U.S.C. § 30704.

Clause 15.1 of the Sea Waybills provides that when Deltech or Stolt deliver "Goods of a dangerous or hazardous nature" to MSC, Deltech and Stolt need to "fully inform [MSC] in writing of the precise and accurate details of the Goods, and special precautions or handling required for the Goods." *Flaminia*, 339 F. Supp. 3d at 245 (quoting Sea Waybills cl. 15.1). In turn, Clause 15.2 provides that Deltech and Stolt "shall be fully liable for and shall indemnify, hold harmless and defend [MSC] … for all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to [MSC] … arising from such Goods and/or from the breach of clause 15.1, whether or not [MSC] was aware of the nature of such goods." *Id.* at 245-46 (quoting Sea Waybills cl. 15.2). The district court held that, because Deltech and Stolt breached Clause 15.1, the breach triggered the obligation to indemnify MSC, Conti, and NSB under Clause 15.2.

6

The Harter Act provides, in relevant part, that "[a] carrier may not insert into any bill of lading or shipping document a provision avoiding its liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery." 46 U.S.C. § 30704. Clause 15.2 provides MSC with an indemnity against its own negligence and is therefore a "provision avoiding liability for loss or damage arising from negligence." *See Flaminia*, 339 F. Supp. 3d at 245.

In reaching that conclusion, this court's decision in *Gibbs v. United States*, 599 F.2d 36 (2d Cir. 1979), is instructive. In that case, we construed a contractual provision that provided as follows:

> The Contractor shall save harmless and indemnify the Postal Service and its officers, agents, representatives, and employees from all claims, loss, damage, actions, causes of action, expense and/or liability resulting from, brought for, or on account of any personal injury or property damage received or sustained by any person, persons, or property growing out of, occurring, or attributable to any work performed under or related to this contract, regardless of whether such claims, loss, damage, actions, cause[s] of action[], expense and/or liability may be attributable to the fault, failure, or negligence of the Contractor.

*Id.* at 40.

In concluding that this language provided the Postal Service with an indemnity against its own negligence, this court emphasized three textual points that resemble the terms of Clause 15.2. First, the contract required that the contractor "save harmless and indemnify" the Postal Service. That language, this court said, "show[s] an intent to encompass indemnification for the indemnitee's negligence." *Id.*

7

Clause 15.2 similarly provides that Deltech "shall indemnify" MSC and hold it harmless.

Second, the contract in *Gibbs* referred to "all claims" that might arise out of the work performed under the contract. This court observed that this language "on its face" covered claims arising out of the government's negligence. *Id.* Clause 15.2's language is similarly comprehensive, requiring Deltech to indemnify MSC for "all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to" MSC arising from the dangerous goods. *Flaminia*, 339 F. Supp. 3d at 245 (quoting Sea Waybills cl. 15.2).

Third, the contract in *Gibbs* provided for indemnification "regardless of whether" the damage to the government "may be attributable to the fault, failure, or negligence of the Contractor." *Gibbs*, 599 F.2d at 40. While this court did not explain why that language implied that the indemnity extended even to liability arising out of the government's own negligence, the most likely reason is that, by untethering liability from the contractor's fault, the language evinced an intent to provide as broad an indemnity as possible. Clause 15.2 works similarly because it states that MSC is entitled to indemnification regardless of "whether or not the Merchant was aware of the nature" of the dangerous goods. *Flaminia*, 339 F. Supp. 3d at 245-46 (quoting Sea Waybills cl. 15.2). For that reason, Clause 15.2 evinces an intent to give a very broad indemnity that encompasses damages arising from MSC's own negligence.

MSC argues that the Harter Act cannot apply because COGSA is incorporated into the Sea Waybills—a contract—and so displaces the Harter Act. That argument cannot succeed because COGSA applies here only as a matter of contract. Because a contract cannot

8

displace a statute, the Harter Act would govern even if there were a conflict between the two statutes. But there is no conflict: As COGSA itself makes clear, it "shall [not] be construed as superseding … any other law[s] which would be applicable in the absence of this Act, insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. § 30701 note. Because the Harter Act "relate[s] to the duties, responsibilities, and liabilities of the … carrier prior to the time when the goods are loaded on … the ship," COGSA would not displace the Harter Act to the extent it would have governed prior to loading. 46 U.S.C. § 30704; *see also English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard*, 814 F.2d 84, 87 (2d Cir. 1987) (stating that "while COGSA defines a carrier's liability 'from the time when the goods are loaded on to the time when they are discharged from the ship,'" the Harter Act applies before loading and after discharge).

Because the contract's language allows MSC to avoid its "liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery," it is void under the Harter Act to the extent that the indemnity extends to pre-loading and post-discharge conduct. 46 U.S.C. § 30704. Because MSC's principal negligence occurred prior to the loading of the vessel, I would remand for the district court to revisit the allocation of fault. As the district court found, MSC developed its stowage plan on June 28, 2012, days before the ship was loaded. *See Flaminia*, 339 F. Supp. 3d at 204. The stowage plan disregarded the warnings provided in the MBLI. *See id.* at 213. Because the development of the stowage plan occurred prior to loading, the Harter Act prohibits MSC from being indemnified from the consequences to the extent that act was negligent.

9

\* \* \*

I agree with the court that the district court erred when it concluded that Deltech and Stolt were liable under a strict liability theory, and I agree that the district court did not err when it concluded (1) that those parties were liable on a negligent-failure-to-warn theory and (2) that Conti, NSB, and NOT were not negligent.

However, the district court did err when it concluded that MSC was not negligent even though it disregarded the instructions on the MBLI. It erred when it held that Stolt could not recover from BDP for breach of contract. And it erred when it concluded that Deltech and Stolt were required to indemnify MSC, Conti, and NSB under Clause 15.2 of the Sea Waybills for MSC's negligent actions performed prior to loading. For those reasons, I dissent in part.