# 18-2974-cv(L), 18-3083-cv(CON)

## United States Court of Appeals

### *for the*

## Second Circuit

IN RE: M/V MSC FLAMINIA

STOLT TANK CONTAINERS B.V., STOLT-NIELSEN USA, INC., DELTECH CORPORATION,

*Plaintiffs-Claimants-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

LAWRENCE K. DEMEO
NICHOLAS D. STELLAKIS
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, Massachusetts 02109
(617) 648-2746

*Attorneys for Plaintiff-Claimant-
  Appellant Deltech Corporation*

JOHN A.V. NICOLETTI
ROBERT A. NOVAK
NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005
(212) 220-3830

*Attorneys for Plaintiffs-Claimants-
  Appellants Stolt Tank Containers
  B.V. and Stolt-Nielsen USA, Inc.*

*(For Continuation of Appearances See Inside Cover)*

ARCELOMITTAL, SNF HOLDINGS, FLOMIN, INC., SNF SAINT AVOLD, SNF SAS, ROAM GLOBAL LOGISTICS LLC, TETRA TECHNOLOGIES NORGE, MILLIKEN & COMPANY, AHLERS EDC, STEINWEG HANDELSVEEM, CISC LIGGETT-DUCAT, BRITISH AMERICAN TOBACCO PLC, LLC, PETRORESURS, UNITED TRANSPORT TANKCONTAINERS BV, GENERAL MILLS UK, AYECUE INTERNACIONAL S.L.U., C.H. ROBINSON INTERNATIONAL INC., C.H.ROBINSON POLAND S.P ZO.O, LINE X ACQUISITION LLC, CLARIANT CORPORATION, PANALPINA, INC., POTTER GROUP, LTD., CLARIANT PRODUCTION, UK LTD., PANALPINA WORLD TRANSPORT LTD., ECOLAB INC., NALCO COMPANY, EASTMAN CHEMICAL COMPANY, RAUAN NALCO LLC, MEXPACK INTERNATIONAL MOVERS S.A. DEC., NSB NIEDERELBE SCHIFFARTSGESELLSCHAFT MBH & CO KG, AS OPERATOR, OF THE VESSEL MSC FLAMINIA, MUELLER WATER PRODUCTS, INC., RIM LOGISTICS, LTD., VCK ROTTERDAM BV, PROTIM SOLIGNUM LTD., GP CELLULOSE GMBH, GP HARMON RECYCLING LLC, EAGLE PAPER INTERNATIONAL, INC., TROUW NUTRITION USA, LLC, CHENG LOONG CORPORATION, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, ACE EUROPEAN GROUP LTD., ACE SEGUROS S.A., ALCAN AUTOMOTIVE LLC, RLI INSURANCE COMPANY, SENATOR INTERNATIONAL OCEAN LLC, PLASTIC OMNIUM AUTOMOTIVE EXTERIOR, BORBET, IAC SPARTANBURG, BEHR INDUSTRIES, MUBECA INC., CARCOUSTICS USA INC., LEAR CORPORATION, MAGNA EXTERIORS AND INTERIORS, PROPER POLYMERS, EXCELL USA INC., TI AUTOMOTIVE, DRAEXLMAIER AUTOMOTIVE AMERICA, BMW GROUP PLAN 2.7, BMW AG WERK 2.7, GULBRANDSEN CHEMICALS INC., NOVOZYMES, NEWPORT TANK CONTAINERS INC., HUNTSMAN PETROCHEMICAL LLC, GRAFTECH SWITZLERLAND S.A., NETWORK AMERICA LINES, GRAFTECH MEXICO, BROKMAK OU, GRAFTECH FRANCES SNC, HUNTSMAN HOLLAND B.V., DELTECH CORPORATION, DELTECH EUROPE LTD., NUCO LOGISTICS, INC., ARR-MAZ CUSTOM CHEMICALS INC., TRIPLE F. LOGISTICS B.V., CRAY VALLEY USA INC., CJ HENDRICKS B.V., THE LUBRIZOIL CORPORATION, LUBRIZOIL FRANCE SA, BERCEN INC., SELLUKEN AB, HELLAS S.A., BULKHAUL (USA) INC., ADPO NV, BULKHAUL LIMITED, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., CHARTIS SEGUROS MEXICO, S.A. DE C.V., AMI TRADING (USA), INC., JEWOMETAAL STAINLESS PROCESSING, ARUBIS AG, SHANDONG JINSHENG NONFERROUS GROUP CO., LTD., ARMSTRONG WORLD INDUSTRIES INC., EXPEDITORS MCO, EXPEDITORS INTERNATIONAL (UK) LTD., ATLAS VAN LINES INTERNATIONAL, OCEANIC CONTAINER LINE, INC., OCEANIC SHIPPING & TRANSPORT GMBH, LAGER, COOPER TIRE & RUBBER COMPANY, COOPER TIRE & RUBBER COMPANY EUROPE LTD., COTY GENVA S.A., COTY US LLC, CRAY VALLEY USA LLC, KINTETSU WORLD EXPRESS (USA) INC., ENVIRONMENTAL EXPRESS INC., METLAB SUPPLIES LTD., DHL GLOBAL FORWARDING, FIRESTONE BUILDING PRODUCTS CO., WEIHAG GMBH, BRIDGEWELL RESOURCES LLC, NIPPON DENKO COMPANY LTD., QUIBORAX S.A., SPECIAL METALS WELDING PRODUCTS COMPANY, PRECISION CASTPARTS, EQUIPOS NUCLEARS SA, MAGNELEC S.A. DE C.V.,

VEITSCH RADEX GMBH & CO. OG, VISCOFAN USA INC., OOO
PROCASING, TAMINCO, INC., UNITED TRANSPORT TANK
CONTAINERS, 3M BELGIUM N.V., INTERBULK (TANK CONTAINERS)
LTD., NUFARM UK LTD., BUTACHIMIE, SKF DE MEXICO, S.A. DE C.V.,
SKF GMBH, UAB NEO GROUP, PRODUCTORA DE TEREFTALATOS DE
ALTAMIRA S.A. DE C.V., EPU SERVICE CENTER, NEK,
SCHLUMBERGER TECHNOLOGY CORPORATION, TERZA S.A. DE C.V.,
GALLEON INTERNATIONAL FREIGHT SERVICE, GROUPEMENT
IVORIEN D'INDUSTRIE ET, TOTAL PETROCHEMICALS & REFINING
USA, INC., AGCS MARINE INSURANCE COMPANY, ROCKWOOD
HOLDINGS, INC., ROCKWOOD LITHIUM, INC., BULKHAUL UK LTD.,
CHEMTALL GMBH, VOLKSWAGON GROUP OF AMERICA, INC., ZENDA
DIENSTLEINSTUNGEN GMBH, RUDOLPH LOGISTIK GRUPPE, GMBH,
VOLSWAGENWERK AG, BAILLIE LUMBER SALES CO, BAILLIE
LUMBER CO., TRINSEO MATERIALS OPERATING S.C.A., STYRON, LLC,
STYRON EUROPE GMBH, INDUSTRIAS JOHN DEERE SA DE C.V.,
WAYAND GMBH, JOHN DEERE INTERNATIONAL GMBH, DOSECC
EXPLORATION SERVICES, LLC, GLOBAL LOGISTICS SHIPPING INC.,
HYDROBIOLOGICAL INSTITUTE-OHRID, RAYONIER, INC., SE TYLOSE
GMBH & CO. KG, VOPAK AGENICIES ROTTERDAM B.V., DOW
CHEMICAL COMPANY, DOW EUROPE GMBH, BDP INTERNATIONAL
NV, ANGUS CHEMIE GMBH, AMERCHOL CORPORATION, ESTEE
LAUDER, INOAC POLYTEC DE MEXICO, SUTTONS INTERNATIONAL,
CENTRE POINT JB NAGAR, UNICHARM CORPORATION, PROCTER &
GAMBLE COMPANY, WESTERLUND, SOCIETE INDUSTRIELLE DE
PAPETERIE, FARMEKO, LIBERTY INTERNATIONAL UNDERWRITERS,
HUNTSMAN CORPORATION, JOHANN HALTERMANN LTD.,
MONUMENT CHEMICAL BVBA, COPPERWELD BIMETALLICS LLC,
RED ELECTRICA DE ESPANA, CONTINENTAL INSURANCE COMPANY,
TOYO COTTON CO., FIBER SOURCE INTERNATIONAL CORP., ASYA
KAGIT MATBAA GIDA VE, TEKSTIL SANTIC AS, STEMACO USA INC.,
SB ENTERPRISES, JA LACOUR COMPANY, GIORGIO GORI USA INC.,
DANZER UK LTD., CNA METALS LIMITED, THAI NGUYEN IRON AND
STEEL JOINT STOCK CORPORATION, OCEANIC LOGISTICS INC.,
EXXONMOBIL CHEMICAL COMPANY, ADVANCED ELASTOMER
SYSTEMS LTD., EXXONMOBIL SPECIALTY ELASTOMERS,
EXXONMOBIL PETROLEUM & CHEMICAL HOLDINGS INC., MOBIL
CHEMICAL PRODUCTS INTERNATIONAL, ESSO SOCIETE ANONYME
FRANCAISE, EXXONMOBIL CHEMICAL FILMS, EXXONMOBIL
CHEMICAL FILMS EUROPE, EMERAUDE INTERNATIONAL SAS, XL
SPECIALTY INSURANCE COMPANY, CABOT CORPORATION, KANSAI
NEROLAC LTD. BILAKHIA HOUSE, TOKIO MARINE & NICHIDO FIRE
INSURANCE CO. LTD., SHINTECH, INC., KLOCKNER PENTAPLAST,
MITSUBISHI CORPORATION, AGRINORTE S.A., ITOCHU PLASTICS PTE
LTD., UNITCARGO CONTAINER LINE, HOLZEXTROPLAST OOO, ASPEN
AMERICAN INSURANCE COMPANY, INTER-TRANS INSURANCE, RAIF
COSKUN CAGLAR, RAINIER OVERSEAS MOVERS INC., VINMAR
INTERNATIONAL LIMITED, TRICON DRY CHEMICALS LLC, MTS
LOGISTICS INC., MTS LOJISTIK VE TASIMACILIK HIZMETLERI TIC
A.S., ELITE HOUSE LLP, TALOOX GROUP LLC, OCEAN WORLD LINES
INC., TRINITY INDUSTRIES INC., ALLSEAS GLOBAL LOGISTICS, HILL
& SMITH LTD., FORMOSA PLASTICS CORPORATION, TCR PLASTICS,
APIEXPORT S.A. DE CV, LAMEX FOODS UK, MULTIENLACES DE

TRANSPORTES INTERNACIONALES SA DE CV, BANKS AND LLOYD
(SHIPPING) LTD., GREAT AMERICAN INSURANCE COMPANY, AL
AHLIA INSURANCE, NIPPONKOA INSURANCE (EUROPE), PROSIGHT
SPECIALTY INSURANCE, CLASSIC AMERICAN HARDWOODS,
CAROLINA OCEAN LINES, TIMBER CONNECTION, PALMER TIMBER,
NADDI MOTORS, LINK LINES LOGISTICS, INC., GOLINK LTD., HANNA
MOTORS, SOCIETY A-N AUTO IMPORT EXPORT, JF HILLEBRAND
MEXICO SA, BAHRAIN MARITIME & MERCANTILE INTERNATIONAL,
WISCO ESPANOLO SA, IVAN LUNA SEGURA, CAROLINAS COTTON
GROWERS CORP., STARR INDEMNITY & LIABILITY COMPANY,
AMERICAN HARDWOOD INDUSTRIES, LLC. TRADELANES, INC.,
CATERPILLAR INC., CATERPILLAR SARL, ENERIA S.A.S., ZEPPELIN
POWER SYSTEM GMBH, ZEPPELIN BAUMASCHINEN GMBH, PON
POWER AS, FINNING (UK) LTD., CARGO PARTNER AG, VINMAR
INTERNATIONAL LTD., CATERPILLAR MARINE POWER (UK) LTD.,
ESCO CORPORATION, KAMIN LLC, OMYA AB, SCHUITE & SCHUITE
DRUCKFARBEN GMBH, OMYA GMBH, KANSAI ALTAN BOYA SANAYI
VE TICARET AS, PROCHEM AG, OOO OMYA URAL, BLAGDEN
SPECIALTY CHEMICALS LTD., STANLEY BLACK & DECKER, INC.,
STANLEY LOGISTICS CENTRE, BLACK & DECKER LIMITED SARL,
EXPEDITORS INTERNATIONAL, DSV AIR & SEA INC., DSV AIR & SEA
LTD., WEATHERFORD INTERNATIONAL INC., SABIC INNOVATIVE US,
SABIC INNOVATIVE PLASTICS BV, SABIC INNOVATIVE PLASTICS
INDIA PVT LTD., SABIC INNOVATIVE PLASTICS MEXICO, CUMMINS
INC., CEVA FREIGHT MANAGEMENT (MEXICO), CWL MEXICO S DE
RL, CEVA FREIGHT (UK) LTD., CRANE WORLDWIDE (UK) LTD.,
WHITMAN LABORATORIES LTD., UNITRANS P.R.A. COMPANY, INC.,
GRAND MEDICAL GROUP, DART CONTAINERS FCA BAHAMAS,
POLYMERS INTERNATIONAL LIMITED, SURREY EUROPE SARL, RED
SQUARE CORPORATION, UNITRANS P.R.A. COMPANY, INC., FTT
CONSULTING, GRAND MEDICAL GROUP, DART CONTAINERS FCA
BAHAMAS, POLYMERS INTERNATIONAL LIMITED, NOMAD BRANDS,
INC. LLC TLC, NCR NEDERLAND, NCR SDC, NCR GLOBAL SOLUTIONS,
GAYLORD CHEMICAL CO. LLC, IMCD BENELUX N.V., ICC CHEMICAL
CORPORATION, FLEUR DE LIS WORLDWIDE, LLC, MTS LOGISTICS,
INC., OOO PIONEER TRADE, PIONEER POLYLEATHERS PVT LTD.,
PARMAR INTERNATIONAL PVT, LTD., INTERNATIONAL
COMMODITITES, ARUBIS BELGIUM NVSA, TYCO INTERNATIONAL
LTD., OCEAN WORLD LINES INC., OWL BELGIUM, HONEYWELL
INTERNATIONAL INC., E RIGAS SA, ANHEUSER-BUSCH
INTERNATIONAL INC., ARKEMA INC., PFAUTH LOGISTIEK
DIENSYVERL, ARKEMA VLISSINGEN BV, PJ LUMBER COMPANY,
LATHAMS LIMITED, RAMSAY TIMBER, JUNKERS INDUSTRIER A/S,
DANZER IK LTD., HARDWOOD DIMENSIONS LTD., TIMBER
CONNECTIONS LTD., TZENG LONG USA, INC., ROCKTENN CP, LLC,
HELVETIA INSURANCE S.A., CHEVRON ORONITE COMPANY LLC,
CHEVRON ORONITE SAS, TURK EKONOMI BAKASI, UAB "JURVISTA",
STOLT TANK CONTAINERS GERMANY GMBH, STOLT TANK
CONTAINERS FRANCE SAS,

*Plaintiffs,*

– v. –

NSB NIEDERELBE SCHIFFAHRTSGESELLSCHAFT MBH & CO. KG, as
operator, of the vessel MSC FLAMINIA, Conti 11 Container Schiffahrts-GmbH
& Co. KG MS MSC Flaminia, MSC MEDITERRANEAN SHIPPING
COMPANY S.A., BDP INTERNATIONAL, INC.,

*Defendants-Appellees,*

RUBICON LLC,

*Third-Party-Defendant-Appellee,*

CHEMTURA EUROPE GMBH, CHEMTURA CORPORATION,
CHEMTURA ITALY S.R.L.,

*Defendants-Counter-Claimants-Appellees.*

**CORPORATE DISCLOSURE STATEMENTS**
**PURSUANT TO RULE 26.1 OF THE**
**FEDERAL RULES OF APPELLATE PROCEDURE**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1(a), Appellant Deltech Corporation states that Deltech Corporation (n/k/a Deltech LLC) is a wholly owned subsidiary of Deltech Holdings LLC, which is a wholly owned subsidiary of Northbridge Holdings LLC, which is a wholly owned subsidiary of Northbridge Acquisition Corporation. No publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellants Stolt-Nielsen USA, Inc. and Stolt Tank Containers B.V. are nongovernmental corporate parties whose corporate parent is Stolt-Nielsen Limited, a publicly-traded company.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

TABLE OF ABBREVIATIONS ........................................................ iii

INTRODUCTION AND RULE 35(B)(1) STATEMENT ....................... 1

FACTS AND PROCEDURAL HISTORY ............................................ 2

    I.    Background Facts ................................................................ 2

    II.    Trial Phase I ....................................................................... 3

    III.    Trial Phase II ..................................................................... 3

    IV.    Panel Decision ................................................................... 4

    V.    MSC's Negligent Conduct ................................................ 4

        A.    MSC Provided an Incorrect Early Vessel Cut-off Date ............. 5

        B.    MSC Instructed NOT to Ignore Warnings/ Instructions ............ 5

        C.    MSC Deliberately Limits the Information Available to Its Planning Department ............................................ 7

ARGUMENT ................................................................................... 9

    I.    The Panel Erred in Holding MSC Was Not Negligent ....................... 9

    II.    The Panel Erred in Holding that MSC is Entitled to Full Indemnity ...................................................................... 12

    III.    The Panel Erred in Holding that Bill of Lading Stowage Provisions, if Included, Would Not Have Been Binding on MSC ........................................................................ 14

CONCLUSION ................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
   775 F.2d 476 (2d Cir. 1985) ....................................................................13

*Chem One, Ltd. v. M/V Rickmers Genoa*,
   502 F. App'x 66 (2d Cir. 2012) ................................................ 1, 10, 11

*Hojgaard & Schultz A/S v. Transamerican S.S. Corp.*,
   590 F. Supp. 916 (S.D.N.Y. 1984), *aff'd*
   762 F.2d 990 (2d Cir. 1985) ....................................................................14

*Rice v. Pennsylvania R.R. Co.*,
   202 F.2d 861 (2d Cir. 1953) ............................................................... 13-14

*St. Johns N.F. Corp. v. Companhia Geral*,
   263 U.S. 119 (1923) ....................................................................................14

*The Delaware*,
   81 U.S. 579 (1871) ......................................................................................14

*The Innocenta*,
   13 F. Cas. 64 (S.D.N.Y. 1879) ..................................................................10

*U.W. Marx, Inc. v. Koko Contracting, Inc.*,
   124 A.D.3d 1121 (2015) ..............................................................................15

**Statutes & Other Authorities:**

46 U.S.C. § 30701 ................................................................................................1

46 U.S.C. § 30704 ......................................................................................... 1, 13

COGSA § 3(2) ....................................................................................................11

# TABLE OF ABBREVIATIONS

ECF     -     Refers to the designated entry(ies) on the case *Docket*.

E     -     Refers to the designated page(s) in the *Exhibits* volumes.

JA     -     Refers to the designated page(s) in the *Joint Appendix*. Reference to a trial declaration will also include a citation to the relevant paragraph(s) of the declaration, for example JA3132 ¶¶ 1, 3.

SPA     -     Refers to the designated page(s) in the *Special Appendix*.

## INTRODUCTION AND RULE 35(B)(1) STATEMENT

For many decades, the Carriage of Goods by Sea Act ("COGSA") has required ocean carriers to heed shippers' warnings and instructions regardless of the method by which they are communicated, while the Harter Act has prohibited carriers from seeking full indemnification from shippers for losses sustained as a result of carriers' own negligence. 46 U.S.C. §§ 30701 (note), 30704; *Chem One, Ltd. v. M/V Rickmers Genoa*, 502 F. App'x 66, 71 (2d Cir. 2012).

As the district court and panel opinions are contrary to both principles, this proceeding presents questions of exceptional importance: (1) whether COGSA now permits an ocean carrier to escape all liability for a casualty because the shippers of dangerous goods provided warnings and instructions to the carrier by means other than those preferred by the carrier; (2) whether a carrier is now permitted to ignore specific warnings/instructions included in Master Bill of Lading Instructions, such that failure to ensure such warnings are included in sea waybills is inconsequential to a determination of liability; and (3) whether the Harter Act now permits carriers to enforce a provision requiring shippers to indemnify carriers for losses sustained due to the carriers' own negligence.

The district court and panel opinions answered each question in the affirmative. That is erroneous as a matter of law since it disregards maritime statutes and Second Circuit case law that have governed the obligations of shippers

1

and carriers of dangerous goods for more than 100 years. The combination of these legal errors dangerously relieves carriers both of the duty to heed warnings and instructions that they receive *and* of the responsibility for losses resulting from carrier's disregard of such warnings. Therefore, appellants respectfully request that their appeal be reheard by the Second Circuit en banc.

## FACTS AND PROCEDURAL HISTORY

### I. Background Facts

Deltech Corporation ("Deltech") is a manufacturer of 80% divinylbenzene ("DVB80"). Panel Op. 9. On June 8, 2012, Deltech requested that Stolt Tank Containers B.V. ("Stolt") — its non-vessel operating common carrier ("NVOCC")[1] —arrange for the shipment of three tanks of DVB80 from Deltech's plant in Louisiana to Belgium. *Id*. 14. On June 11, Stolt contacted Mediterranean Shipping Company ("MSC") to reserve space aboard an ocean vessel. *Id*. MSC reserved space aboard the MSC FLAMINIA, with an estimated sailing date of June 30. JA9026. The FLAMINIA actually sailed from the New Orleans Terminal ("NOT") on July 1. Panel Op. 15. Two weeks into the voyage, a tank of DVB80 auto-polymerized and vapors vented from the tank were ignited when a crew member opened a hatch, resulting in an explosion and fire (the "Casualty"). *Id*.

---

[1] NVOCCs "assist a cargo shipper with making necessary arrangements for the booking of any pre-carriage" and "booking for ocean carriage." Panel Op. 9 n.3.

## II.    Trial Phase I

The first phase of trial, in the United States District Court for the Southern District of New York (Forrest, *J.*), addressed the causes of the Casualty. The district court found the following to be among the "substantial contributing factors" that led to the DVB80's auto-polymerization: (1) that it was left on the dock at NOT for 10 days in the sun, in hot weather, and next to a number of tanks of hot molten diphenylamine ("DPA"); (2) its placement in Hold 4 of the FLAMINIA, where it was again stowed next to containers of heated DPA and near the ship's heated fuel tanks; and (3) the lack of proper ventilation in the hold, leading to hotter-than-typical ambient temperatures. Panel Op. 5.

## III.    Trial Phase II

The second phase of trial addressed liability. The district court found Deltech and Stolt together wholly responsible for all losses under theories of strict liability and negligent failure to warn. It also held that MSC did not breach any duty with respect to its storage of DVB80 at NOT, its stowage in the vessel, or its handling of the cargo. *Id*. It also held that the failure of BDP International, Inc. ("BDP")[2] to ensure that MSC's sea waybills contained Deltech's stowage instructions/warnings did not cause damage to Stolt. *Id*.

---

[2] Stolt subcontractor that prepared shipping documents. Panel Op. 11.

3

**IV.    Panel Decision**

The panel reversed the district court's determination that Deltech and Stolt are strictly liable under COGSA, but affirmed its ruling that Deltech and Stolt are liable under a failure-to-warn theory. *Id*. It also affirmed that MSC was not negligent in its treatment of the shipment. Of note, the panel affirmed the district court's finding that MSC was justified in relying solely on one document—a Dangerous Goods Declaration ("DGD")—for communication of warnings and instructions, and ignoring any and all warnings and instructions conveyed to MSC outside of that single document. *Id*. 34.

In a separate opinion dissenting in part, Justice Menashi disagreed with the panel on three issues, holding: (1) the district court erred in holding that MSC was not negligent; (2) the district court erred in holding that Stolt's breach of contract claim against BDP is not actionable; and (3) MSC is not entitled to full indemnification from Deltech/Stolt. Dissent Op. 1. Justice Menashi was correct.

**V.    MSC's Negligent Conduct**

Throughout its carriage of Deltech's DVB80, MSC deliberately ignored Stolt/Deltech's warnings, put its own convenience above the safe handling of dangerous goods, and violated its own internal protocols.

4

### A. MSC Provided an Incorrect Early Vessel Cut-off Date

MSC was negligent from the outset. On June 11, after Stolt contacted MSC to reserve vessel space, MSC sent Booking Confirmations for carriage of "Dangerous Cargo" aboard the FLAMINIA, with an estimated sailing date of June 30. JA9026; E5233-42. Therein, MSC instructed Stolt that the tanks had to be delivered to NOT no later than June 26 ("vessel cutoff date") and that Stolt had to provide MSC with its Master Bill of Lading Instructions ("MBLI") no later than June 26 ("document cutoff date"). *Id*. Because the MBLI contain information such as the tank number and weight, the DVB80 tanks had to be filled no later than June 25 in order to comply with MSC's document cutoff date. The tanks were filled with DVB80 and delivered to NOT, MSC's agent, on June 21. Panel Op. 14-15.

At trial, the Director of MSC's Planning Department testified that the vessel cutoff date should be *two* days before the vessel is loaded. JA3142-43. Yet MSC's Booking Confirmations listed a vessel cutoff date of June 26—*four* days earlier. E5233-42. And the FLAMINIA departed late, on July 1. Panel Op. 15. Since MSC did not follow its own protocols, the DVB80 sat in the sun at NOT, next to molten DPA, for at least two days longer than necessary.

### B. MSC Instructed NOT to Ignore Warnings/ Instructions

Two documents accompanied the DVB80 and were provided to NOT on June 21. The first, Deltech's Straight Bill of Lading ("SBOL"), instructed NOT:

5

> SEE ATTACHED MATERIAL SAFETY DATA SHEET FOR
> EMERGENCY RESPONSE INFORMATION. PRODUCT IS HEAT
> SENSITIVE! DO NOT APPLY HEAT TO CONVEYANCE DURING
> TRANSIT. IF PRODUCT TEMPERATURE EXCEEDS 100°F, CONTACT
> DELTECH IMMEDIATELY.

Panel Op. 16. The second, a Material Safety Data Sheet ("MSDS"), contained "the

most detailed and explicit instructions and warnings about DVB80." *Id*. It

provided: "Closed containers of DVB (80%) may build up explosive pressures

when exposed to the heat of fires"; "Closed containers of DVB (80%) exposed to

heat may begin to polymerize in an exothermic manner leading to auto acceleration

and rapid pressure increase and explosion potential"; DVB80 should be stowed in

a "cool area or refrigerated tank away from high temperatures, hot pipes or direct

sunlight"; "[a]void excessive heat and keep away from open flames or ignition

sources"; and "[m]aintain temperature below 80°F (27°C)". *Id*.

Despite these warnings, NOT stored the DVB80 outside, exposed to hot

Louisiana summer weather, and surrounded by three tanks of molten DPA, which

had been heated to temperatures exceeding 159.8°F. JA2877; JA2879; JA2881.

This improper storage was MSC's deliberate choice. MSC instructed its

agent NOT, which it partially owns, to ignore all warnings/instructions regarding

the safe handling of dangerous goods that NOT receives from shippers. JA3078,

3018, ¶¶ 10, 26-27. MSC instructed NOT to instead only follow special handling

instructions from MSC. JA3078 ¶ 10. Following these instructions, when NOT

6

receives a SBOL and MSDS, it "throws it in a box" and never looks at it again.

JA4693. Compounding the problem, MSC did not provide NOT with any

instructions regarding the safe handling of Deltech's DVB80. JA3085 ¶ 46.

### C. MSC Deliberately Limits the Information Available to Its Planning Department

MSC also deliberately limits the information available to its Planning

Department, which creates stowage plans. At trial, MSC testified that it *could* have

populated its computer systems with shippers' safety warnings and instructions,

but did not. JA8719; JA8725. Instead, MSC chose to populate its databases with

minimal information: UN Number, Proper Shipping Name ("PSN"), Class, and

Packing Group. E7520-35; JA720. MSC provides its planners with a load file that

contained only the UN Number and Class, but not the PSN. E7585-626; JA6254,

JA6263, JA6265. It instructed the planners to ignore any warnings or instructions

received other than in the load file. JA6254-55, JA6262-63, JA6265-66, JA6283;

JA4792. MSC's vessel planners thus received no safety warnings and instructions

unless that information was on a DGD.

For example, MSC deliberately ignored warnings it was given on June 25

when, in accordance with the instructions on MSC's Booking Confirmations, BDP

emailed Stolt's MBLI to MSC. Panel Op. 18, 34; E5262-73. The MBLI contained

the following explicit instructions: "DO NOT STOW NEAR HEAT SOURCES.

STOW ABOVE DECK FOR TEMPERATURE MONITORING." *Id.*

7

MSC, however, left this information off of the sea waybills[3] it prepared, and BDP failed to ensure that MSC's sea waybills actually contained Deltech's required stowage terms. Panel Op. 18. Accordingly, BDP wrongly bound Stolt to contracts of carriage with MSC that did not contain Deltech's required stowage provisions. BDP admitted that the sea waybills should have contained the stowage provisions and the fact that they did not was an error. JA5930.

On June 26, Stolt sent DGDs to MSC with respect to the DVB80. Panel Op. 18, 34. Unlike the SBOL, MSDS, and MBLI, all of which MSC was already in possession, the DGDs did not contain Deltech's warnings/instructions. *Id*.

MSC developed its stowage plan for the FLAMINIA on June 28. Panel Op. 46 n.31; JA9030. The vessel arrived at NOT on June 30 and loading was completed on July 1. JA9030. The three tanks of DVB80 were stowed below deck, in a hold (Hold 4) that was flanked by wing tanks containing heavy fuel oil (heated to between 113°F and 140°F) and in which ventilation was compromised, and surrounded again by tanks of hot DPA. Panel Op. 15; JA2886; JA2891; JA2902.

When it prepared the Flaminia stowage plan on June 28, MSC knew the properties of DVB, that it was heat sensitive, and that safe stowage required adherence to Deltech's warnings and instructions. MSC had this information explicitly for the DVB80 carried aboard the FLAMINIA, via the MBLI. MSC had

---

[3] A nonnegotiable contract of carriage. Panel Op. 18 n.14.

also carried DVB 127 times before the FLAMINIA voyage. SPA261; E7749-62.

Again, however, MSC's planners knew none of this, and by design.

## ARGUMENT

### I.     The Panel Erred in Holding MSC Was Not Negligent

As Justice Menashi correctly opined, the district court's and panel's opinions finding no negligence on the part of MSC were erroneous. Dissent Op. 1. Any mistake Deltech and Stolt made with respect to its shipment of DVB80 does not relieve MSC of its obligations, nor does it excuse its protocol violations.

As Justice Menashi concluded, there is "no doubt" that "MSC received information concerning the stowage of DVB80 but failed to heed those warnings." Dissent Op. 1. On June 25, MSC received the MBLI which explicitly stated: "DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING." *Id*. "Had MSC complied with the instructions, the DVB80 might not have autopolymerized and exploded." *Id*. 2. That is, compliance with these instructions would have prevented MSC from stowing the DVB80 in Hold 4 surrounded by molten hot DPA and the vessel's heated fuel— both of which the district court identified as having "substantially contributed" to the autopolymerization. *Id*.

The district court and the panel erroneously focused on the method by which Stolt communicated with MSC. The district court identified "the DGD as the locus

9

of critical information and warnings about the dangers of goods" and concluded that "Stolt's DGDs were defective." JA9100. As Justice Menashi opined, however, "the district court's emphasis on those documents was misplaced." Dissent Op. 2. "COGSA does not require a shipper to use any particular method … to inform a carrier of the dangerous properties of its cargo." *Rickmers*, 502 F. App'x at 71. Nor can MSC rely on custom and practice, which can be invoked only where the practice is "so generally known and acknowledged and acted upon, as virtually to be applied by the whole of that part of the business community which it would affect." *The Innocenta*, 13 F. Cas. 64, 65 (S.D.N.Y. 1879). The district court itself acknowledged that "other shippers and NVOCCs had included handling instructions on bills of lading or other non-DGD documents." JA9059-60. As Justice Menashi correctly held, "[b]ecause neither COGSA nor maritime custom permits a carrier to ignore information other than that contained in the DGDs, MSC was not entitled to disregard the warning because it was not presented on a particular form." Dissent Op. 3.

MSC's other excuse, that the MBLI were "functionally useless" because they were not sent to MSC until after the DVB80 was filled and delivered to NOT, in equally unavailing. Panel Op. 35. MSC received the MBLI on June 25—three days before MSC developed its stowage plan and five days before the vessel was loaded. Dissent Op. 3. MSC had time to heed those warnings when developing its

10

stowage plan. Moreover, even though the DVB80 had already been delivered to NOT, MSC still could have removed the tanks from sunlight and proximity to molten DPA. It could have at least contacted Stolt/Deltech to determine the risks of failing to follow the instructions on the MBLI. *Id*. 4. Yet, MSC did nothing.

Because MSC did nothing to heed the instructions/warnings it received from Stolt, despite having a duty to listen to them regardless of the method by which they were communicated, the district court's finding that MSC was not negligent should be reversed. COGSA § 3(2); *Rickmers*, 502 F. App'x at 71; Dissent Op. 4.

Moreover, MSC has a duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." COGSA § 3(2). This duty is separate from and unimpacted by any duties owed by Stolt and Deltech. Requiring Stolt to deliver the DVB80 to NOT days earlier than necessary and instructing NOT to ignore the warnings it received on the SBOL and MSDS resulted in the DVB80 being stored in the Louisiana summer sun, surrounded by hot DPA. MSC's refusal to consider anything except the Class and UN number of dangerous goods when planning stowage resulted in the DVB80 being stowed below deck in an unventilated hold, flanked by tanks of heated fuel, and again surrounded by molten DPA. The district court found that the conditions under which DVB80 was stored at NOT and stowed aboard the FLAMINIA were both "substantial contributing

11

factor[s]" to the Casualty. Panel Op. 20. The district court and panel erred by refusing to hold MSC accountable for this conduct.

The district court's finding that MSC did not breach any duty with respect to the Casualty should be reversed, and the matter should be remanded to determine to what extent MSC's breach of its duty of care gives rise to liability and to apportion fault between Deltech, Stolt, and MSC accordingly.

## II.    The Panel Erred in Holding that MSC is Entitled to Full Indemnity

The panel erred in affirming the district court's finding that Clause 15.2[4] of the sea waybills issued by MSC to Stolt require Stolt/Deltech to indemnify MSC for *all* losses MSC sustained in the Casualty. Panel Op. 46-47. As Justice Menashi correctly opined in dissent, the Harter Act prohibits carriers from inserting into sea waybills any provision requiring a shipper to indemnify the carrier for the carrier's own negligence. Dissent Op. 6-9. As MSC's sea waybills purport to do this very thing, they are unenforceable. To hold otherwise would nullify provisions of a statute that has governed the obligations of ocean carriers for 130 years.

The Harter Act provides in no uncertain terms that "[a] carrier may not insert into any bill of lading or shipping document a provision avoiding its liability for

---

[4]  Which reads: "[Stolt/Deltech] shall be fully liable for and shall indemnify, hold harmless and defend [MSC] … for all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to [MSC] … arising from such Goods and/or from the breach of clause 15.1, whether or not [MSC] was aware of the nature of such goods." Dissent Op. 6

12

loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery." 46 U.S.C. § 30704. "Any such provision is void." *Id*. The panel opinion did not reach the issue of the enforceability of Clause 15.2. Panel Op. 47 n.33. Justice Menashi did, noting that Clause 15.2 is precisely the type of "provision avoiding liability for loss or damage arising from negligence" that is prohibited by the Harter Act. Dissent Op. 7. Clause 15.2 should therefore be "void" in its entirety. *Id*. ("Any such provision is void."); *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985).

Even if Clause 15.2 is not voided entirely and survives to require Stolt and Deltech to indemnify MSC for *Stolt/Deltech's* negligence, the district court's errors with respect to MSC's negligence detailed above require that this matter be remanded for a new trial to revisit the allocation of fault. As Justice Menashi opined, to the extent that the trial court on remand finds MSC at fault with respect to its pre-loading conduct, "the Harter Act prohibits MSC from being indemnified from the consequences." Dissent Op. 9.

Separately, Clause 15.2 is unenforceable for the additional reason that it runs counter to long-standing Second Circuit maritime common law. Under general tenets of contract interpretation in admiralty, "contracts will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivocal terms." *Rice v. Pennsylvania R.R. Co*., 202 F.2d 861, 862 (2d Cir.

1953). The panel did not reach this issue either. But a plain reading of Clause 15.2 shows that it is not "expressed in unequivocal terms" that it is meant to indemnify MSC for losses arising out of its own negligence. Clause 15.2 is thus also unenforceable under binding Second Circuit precedent.

### III. The Panel Erred in Holding that Bill of Lading Stowage Provisions, if Included, Would Not Have Been Binding on MSC

"It is undisputed that BDP failed to obtain from MSC a Sea Waybill that included the correct stowage instructions and that, in this way, BDP breached its contractual obligations to Stolt." Panel Op. 43. However, the panel ignored Second Circuit and Supreme Court precedent that bill of lading stowage provisions, if included, would have been binding on MSC. "[T]he Supreme Court has held that the bill of lading governs where cargo is to be stowed and the terms of a separate freight agreement such as [a] booking note … has no qualifying effect." *Hojgaard & Schultz A/S v. Transamerican S.S. Corp.*, 590 F. Supp. 916, 921 (S.D.N.Y. 1984), *aff'd* 762 F.2d 990 (2d Cir. 1985) (citing *St. Johns N.F. Corp. v. Companhia Geral*, 263 U.S. 119, 123-24 (1923)). A bill of lading "is twofold in its character; that is, it is a receipt as to the quantity and description of the goods shipped, and a contract to transport and deliver the goods to the consignee or other person therein designated, and upon the terms specified in the same instrument." *The Delaware*, 81 U.S. 579 (1871). Thus, contrary to the panel's suggestion that the bill of lading stowage provisions, if included, would not have been operative, the stowage

14

provisions would have been binding contractual requirements that MSC could not have ignored, except to its own detriment.

Moreover, the panel opinion is contrary to Second Circuit precedent because MSC's independent breach of the contract of carriage would have precluded it from enforcing Clause 15 against Stolt. Justice Menashi correctly determined that MSC's contractual breach would render it liable to Stolt for its lack of proper stowage, and that MSC could not enforce the indemnity provision in the sea waybills against Stolt due to its own breach. Dissent Op. 4-6; *U.W. Marx, Inc. v. Koko Contracting, Inc.*, 124 A.D.3d 1121, 1122 (2015) (one party's prior material breach relieves other party of duty to perform remaining contractual obligations).

Due to BDP's breach of its contractual obligations to Stolt, Stolt could not raise MSC's failure to comply with contractual stowage obligations in defense of MSC and NSB/Conti's indemnity claims against Stolt under Clause 15.1. Thus, BDP's breach *did* cause direct and proximate damage to Stolt: it deprived Stolt of contractual rights which exposed Stolt to a greater category of damages in this action (indemnity damages in addition to actual damages). Justice Menashi was correct in concluding that BDP's breach altered MSC's legal obligations.

## CONCLUSION

The Court should grant panel rehearing or rehearing en banc.

15

Respectfully submitted,

/s/ *Lawrence K. DeMeo*
Lawrence K. DeMeo
Nicholas D. Stellakis
Hunton Andrews Kurth LLP
60 State Street, Suite 2400
Boston, Massachusetts 02109
(617) 648-2800
LDeMeo@HuntonAK.com
NStellakis@HuntonAK.com

*Counsel for Appellant Deltech Corporation*


/s/ *John A.V. Nicoletti*
John A.V. Nicoletti
Robert A. Novak
Nicoletti Hornig & Sweeney
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, NY 10005
(212) 220-3830
JNicoletti@nicolettihornig.com
RNovak@nicolettihornig.com

*Counsel for Appellants Stolt Nielsen USA
Inc., and Stolt Tank Containers B.V.*


Dated: July 14, 2023

## COMBINED CERTIFICATIONS

## CERTIFICATE OF COMPLIANCE UNDER FED. R. APP. P. 32(g)

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 3,576 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July 2023, this document was filed through the Electronic Case Filing system, and that copies will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Lawrence K. DeMeo*
Lawrence K. DeMeo

# Addendum

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2019

(Argued: May 15, 2020    Decided: June 30, 2023)

Docket Nos. 18-2974-cv(L), 18-3083-cv(CON)

---

IN RE: *M/V MSC FLAMINIA*

---

Stolt Tank Containers B.V., Stolt-Nielsen USA, Inc., Deltech Corporation,

*Plaintiffs-Claimants-Appellants*,

ArcelorMittal, SNF Holdings, Flomin, Inc., SNF Saint Avold, SNF SAS, Roam Global Logistics LLC, Tetra Technologies Norge, Milliken & Company, Ahlers EDC, Steinweg Handelsveem, CISC Liggett-Ducat, British American Tobacco PLC, LLC, Petroresurs, United Transport Tankcontainers BV, General Mills UK, Ayecue Internacional S.L.U., C.H. Robinson International Inc., C.H. Robinson Poland S.P ZO.O, Line X Acquisition LLC, Clariant Corporation, Panalpina, Inc., Potter Group, Ltd., Clariant Production, UK Ltd., Panalpina World Transport Ltd., Ecolab Inc., Nalco Company, Eastman Chemical Company, Rauan Nalco LLC, Mexpack International Movers S.A. deC., NSB Niederelbe Schiffahrtsgesellschaft MBH & Co KG, as operator, of the vessel MSC FLAMINIA, Mueller Water Products, Inc., Rim Logistics, Ltd., VCK Rotterdam BV, Protim Solignum Ltd., GP Cellulose GMBH, GP Harmon Recycling LLC, Eagle Paper International, Inc., Trouw Nutrition USA, LLC, Cheng Loong Corporation, Indemnity Insurance Company of North America, Ace European Group Ltd., Ace Seguros S.A., Alcan Automotive LLC, RLI Insurance Company, Senator International Ocean LLC, Plastic Omnium Automotive Exterior, Borbet, IAC Spartanburg, Behr Industries, Mubeca Inc., Carcoustics USA Inc., Lear Corporation, Magna Exteriors and Interiors, Proper Polymers, Excell USA Inc., TI Automotive, Draexlmaier Automotive America, BMW Group Plan 2.7, BMW AG Werk 2.7, Gulbrandsen Chemicals Inc.,

Novozymes, Newport Tank Containers Inc., Huntsman Petrochemical LLC, Graftech
Switzerland S.A., Network America Lines, Graftech Mexico, Brokmak OU, Graftech
France SNC, Huntsman Holland B.V., Deltech Corporation, Deltech Europe Ltd., Nuco
Logistics, Inc., ARR-MAZ Custom Chemicals Inc., Triple F. Logistics B.V., Cray Valley
USA Inc., CJ Hendricks B.V., The Lubrizoil Corporation, Lubrizoil France SA, Bercen
Inc., Selluken AB, Hellas S.A., Bulkhaul (USA) Inc., ADPO NV, Bulkhaul Limited,
National Union Fire Insurance Company of Pittsburgh, PA., Chartis Seguros Mexico,
S.A. de C.V., AMI Trading (USA), Inc., Jewometaal Stainless Processing, Arubis AG,
Shandong Jinsheng NonFerrous Group Co., Ltd., Armstrong World Industries Inc.,
Expeditors MCO, Expeditors International (UK) Ltd., Atlas Van Lines International,
Oceanic Container Line, Inc., Oceanic Shipping & Transport GMBH, Lager, Cooper Tire
& Rubber Company, Cooper Tire & Rubber Company Europe Ltd., Coty Geneva S.A.,
Coty US LLC, Cray Valley USA LLC, Kintetsu World Express (USA) Inc.,
Environmental Express Inc., Metlab Supplies Ltd., DHL Global Forwarding, Firestone
Building Products Co., Wiehag GMBH, Bridgewell Resources LLC, Nippon Denko
Company Ltd., Quiborax S.A., Special Metals Welding Products Company, Precision
Castparts, Equipos Nucleares SA, Magnelec S.A. De C.V., Veitsch Radex GMBH & Co.
OG, Viscofan USA Inc., OOO Procasing, Taminco, Inc., United Transport Tank
Containers, 3M Belgium N.V., Interbulk (Tank Containers) Ltd., Nufarm UK Ltd.,
Butachimie, SKF De Mexico, S.A. De C.V., SKF GMBH, UAB Neo Group, Productora De
Tereftalatos De Altamira S.A. De C.V., EPU Service Center, NEK, Schlumberger
Technology Corporation, Terza S.A. De C.V., Galleon International Freight Service,
Groupement Ivoirien D'Industrie ET, Total Petrochemicals & Refining USA, Inc., AGCS
Marine Insurance Company, Rockwood Holdings, Inc., Rockwood Lithium, Inc.,
Bulkhaul UK Ltd., Chemtall GMBH, Volkswagen Group of America, Inc., Zenda
Dienstleistungen GMBH, Rudolph Logistik Gruppe, GMBH, Volswagenwerk AG,
Baillie Lumber Sales Co, Baillie Lumber Co., Trinseo Materials Operating S.C.A., Styron,
LLC, Styron Europe GMBH, Industrias John Deere SA De C.V., Wayand GMBH, John
Deere International GMBH, DOSECC Exploration Services, LLC, Global Logistics
Shipping Inc., Hydrobiological Institute-Ohrid, Rayonier, Inc., SE Tylose GMBH & Co.
KG, Vopak Agencies Rotterdam B.V., Dow Chemical Company, DOW Europe Gmbh,
BDP International NV, Angus Chemie GMBH, Amerchol Corporation, Estee Lauder,
Inoac Polytec De Mexico, Suttons International, Centre Point JB Nagar, Unicharm
Corporation, Procter & Gamble Company, Westerlund, Societe Industrielle De
Papeterie, Farmeko, Liberty International Underwriters, Huntsman Corporation,
Johann Haltermann Ltd., Monument Chemical BVBA, Copperweld Bimetallics LLC,
Red Electrica De Espana, Continental Insurance Company, Toyo Cotton Co., Fiber
Source International Corp., Asya Kagit Matbaa Gida Ve, Tekstil Santic AS, Stemaco
USA Inc., SB Enterprises, JA Lacour Company, Giorgio Gori USA Inc., Danzer UK Ltd.,

CNA Metals Limited, Thai Nguyen Iron and Steel Joint Stock Corporation, Oceanic Logistics Inc., Exxonmobil Chemical Company, Advanced Elastomer Systems Ltd., Exxonmobil Specialty Elastomers, Exxonmobil Petroleum & Chemical Holdings Inc., Mobil Chemical Products International, Esso Societe Anonyme Francaise, Exxonmobil Chemical Films, Exxonmobil Chemical Films Europe, Emeraude International SAS, XL Specialty Insurance Company, Cabot Corporation, Kansai Nerolac Ltd. Bilakhia House, Tokio Marine & Nichido Fire Insurance Co. Ltd., Shintech, Inc., Klockner Pentaplast, Mitsubishi Corporation, Agrinorte S.A., Itochu Plastics PTE Ltd., Unitcargo Container Line, Holzextroplast OOO, Aspen American Insurance Company, Inter-Trans Insurance, Raif Coskun Caglar, Rainier Overseas Movers Inc., Vinmar International Limited, Tricon Dry Chemicals LLC, MTS Logistics Inc., MTS Lojistik Ve tasimacilik Hizmetleri Tic A.S., Elite House LLP, Taloox Group LLC, Ocean World Lines Inc., Trinity Industries Inc., Allseas Global Logistics, Hill & Smith Ltd., Formosa Plastics Corporation, TCR Plastics, Apiexport S.A. De CV, Lamex Foods UK, Multienlaces De Transportes Internacionales SA De CV, Banks And Lloyd (Shipping) Ltd., Great American Insurance Company, Al Ahlia Insurance, Nipponkoa Insurance (Europe), Prosight Specialty Insurance, Classic American Hardwoods, Carolina Ocean Lines, Timber Connection, Palmer Timber, Naddi Motors, Link Lines Logistics, Inc., Golink Ltd., Hanna Motors, Society A-N Auto Import Export, JF Hillebrand Mexico SA, Bahrain Maritime & Mercantile International, Wisco Espanola SA, Ivan Luna Segura, Carolinas Cotton Growers Corp., Starr Indemnity & Liability Company, American Hardwood Industries, LLC. Tradelanes, Inc., Caterpillar Inc., Caterpillar SARL, Eneria S.A.S., Zeppelin Power System GMBH, Zeppelin Baumaschinen GMBH, Pon Power AS, Finning (UK) Ltd., Cargo Partner AG, Vinmar International Ltd., Caterpillar Marine Power (UK) Ltd., Esco Corporation, Kamin LLC, OMYA AB, Schuite & Schuite Druckfarben GMBH, OMYA GMBH, Kansai Altan Boya Sanayi Ve Ticaret AS, Prochem AG, OOO OMYA URAL, Blagden Specialty Chemicals Ltd., Stanley Black & Decker, Inc., Stanley Logistics Centre, Black & Decker Limited SARL, Expeditors International, DSV Air & Sea Inc., DSV Air & Sea Ltd., Weatherford International Inc., Sabic Innovative US, Sabic Innovative Plastics BV, Sabic Innovative Plastics India PVT Ltd., Sabic Innovative Plastics Mexico, Cummins Inc., Ceva Freight Management (Mexico), CWL Mexico S De RL, Ceva Freight (UK) LTD., Crane Worldwide (UK) Ltd., Whitman Laboratories Ltd., Unitrans P.R.A. Company, Inc., Grand Medical Group, Dart Containers FCA Bahamas, Polymers International Limited, Surrey Europe SARL, Red Square Corporation, Unitrans P.R.A. Company, Inc., FTT Consulting, Grand Medical Group, Dart Containers FCA Bahamas, Polymers International Limited, Nomad Brands, Inc. LLC TLC, NCR Nederland, NCR SDC, NCR Global Solutions, Gaylord Chemical Co. LLC, IMCD Benelux N.V., ICC Chemical Corporation, Fleur De Lis Worldwide, LLC, MTS Logistics, Inc., OOO Pioneer Trade, Pioneer Polyleathers PVT Ltd., Parmar

International PVT, Ltd., International Commodities, Arubis Belgium NVSA, Tyco
International Ltd., Ocean World Lines Inc., OWL Belgium, Honeywell International
Inc., E Rigas SA, Anheuser-Busch International Inc., Arkema Inc., Pfauth Logistiek
Diensyverl, Arkema Vlissingen BV, PJ Lumber Company, Lathams Limited, Ramsay
Timber, Junkers Industrier A/S, Danzer IK Ltd., Hardwood Dimensions Ltd., Timber
Connections Ltd., Tzeng Long USA, Inc., Rocktenn CP, LLC, Helvetia Insurance S.A.,
Chevron Oronite Company LLC, Chevron Oronite SAS, Turk Ekonomi Bakasi, UAB
"Jurvista", Stolt Tank Containers Germany GMBH,
Stolt Tank Containers France SAS,

*Plaintiffs,*

–v.–

NSB Niederelbe Schiffahrtsgesellschaft MBH & Co. KG, as operator, of the vessel MSC
FLAMINIA, Conti 11 Container Schiffahrts-GmbH & Co. KG MS MSC Flaminia, MSC
Mediterranean Shipping Company S.A., BDP International, Inc.,

*Defendants-Appellees,*

Rubicon LLC,

*Third-Party-Defendant–*
*Appellee,*

Chemtura Europe GmbH, Chemtura Corporation, Chemtura Italy S.R.L.,

*Defendants–Counter-*
*Claimants–Appellees.**

———————

B e f o r e :

CHIN, CARNEY, and MENASHI, *Circuit Judges.*

———————

Deltech Corp. ("Deltech"), a chemical manufacturer, joins here with Stolt-Nielsen
USA, Inc., and Stolt Tank Containers B.V. (together, "Stolt"), a shipping concern, to
challenge the district court's determination that they alone bear liability for damages

---

* The Clerk of the Court is directed to amend the caption to conform to the above.

caused by an explosion and fire that took place in June 2012 aboard the ocean-going vessel M/V MSC Flaminia. Two weeks into the Flaminia's trip from New Orleans Terminal across the Atlantic, three tanks of 80% grade divinylbenzene (DVB-80) manufactured by Deltech and shipped by Stolt exploded, and a fire then ignited, killing several members of the ship's crew, injuring others, and damaging the ship and its cargo.

In the first phase of a three-part proceeding in the United States District Court for the Southern District of New York (Forrest, *J.*), the district court addressed the causes of the explosion. It determined that the decision to ship DVB-80 from New Orleans Terminal rather than a northeastern port, the early filling of the DVB-80 containers and their early transport to New Orleans Terminal, the conditions in which the tanks of DVB-80 were kept at New Orleans Terminal, and their placement and stowage onboard the Flaminia were the primary causes of the explosion. These conditions resulted in the chemical undergoing runaway auto-polymerization, emitting a cloud of vapor that was ultimately ignited when the crew's firefighting efforts generated a spark. *See In re M/V MSC FLAMINIA*, No. 12-cv-8892 (KBF), 2018 WL 526549, at *30-31 (S.D.N.Y. Jan. 23, 2018) ("*Phase I*"). In the second phase, the district court addressed liability for cargo loss and damage. (Separately, claims for death and bodily injury had largely been settled.) It found Deltech and Stolt together wholly responsible for those losses: Deltech, at a 55% level, and Stolt, at 45%. *See In re M/V MSC FLAMINIA*, 339 F. Supp. 3d 185, 229–30 (S.D.N.Y. 2018) ("*Phase II*"). It exculpated other parties to the shipping transaction from legal liability. It is this decision that Deltech and Stolt challenge now in an interlocutory appeal. (In further proceedings, the court will make and apportion a damages award among those parties still pursuing claims. *Id.* at 191.)

On review, we affirm in part and reverse in part. We REVERSE the district court's determination that Deltech and Stolt are strictly liable under Section 4(6) of the Carriage of Goods at Sea Act ("COGSA"), 46 U.S.C. § 30701 (note), but we AFFIRM its ruling that Deltech and Stolt are liable under a failure-to-warn theory pursuant to Section 4(3) of COGSA. As to the other defendants, we AFFIRM the district court's conclusion that the carrier and related shipowner interests—MSC Mediterranean Shipping Company S.A. ("MSC"), Conti 11 Container Schiffahrts-GMBH & Co. KG MSC "FLAMINIA" ("Conti"), and NSB Niederelbe Schiffahrtsgesellschaft MBH & Co. KG ("NSB")—were not negligent in their treatment of the shipment, and that New Orleans Terminal too was not negligent. We also AFFIRM the district court's determination that Stolt has not stated a claim against its subcontractor, the documentation provider BDP International, Inc. ("BDP"), because we agree that Stolt failed to show that BDP's breach in processing the shipment's waybill was a contributing cause of the damages. Finally, we AFFIRM the district court's

5

determination that MSC, Conti, and NSB are entitled to indemnification for their losses by Stolt and Deltech.

Judge Menashi concurs in part and dissents in part in a separate opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

———————

NICHOLAS D. STELLAKIS (Lawrence K. DeMeo, Brian J. Bosworth, *on the brief*), Hunton Andrews Kurth LLP, Boston, MA; Timothy J. McDonnell, Joseph J. Perrone (*on the brief*), Giuliano McDonnell & Perrone LLP, New York, NY, *for Claimant-Appellant Deltech Corporation.*

JOHN A.V. NICOLETTI (James F. Sweeney, Robert A. Novak, Richard W. Stone II, *on the brief*), Nicoletti Horning & Sweeney, New York, NY; Stephen V. Rible (*on the brief*), Mendes & Mount LLP, New York, NY, *for Claimants-Appellants Stolt-Nielsen USA, Inc. and Stolt Tank Containers B.V.*

JAMES W. JOHNSON, Ricci Tyrrell Johnson & Grey, Philadelphia, PA, *for Defendant-Appellee BDP International, Inc.*

PETER R. KNIGHT (Joseph L. Clasen, Trevor L. Bradley, *on the brief*), Robinson & Cole LLP, New York, NY, *for Defendants-Appellees Chemtura Europe GmbH, Chemtura Corporation, Chemtura Italy S.R.L., and Rubicon LLC.*

EUGENE J. O'CONNOR (Timothy Semenoro, *on the brief*), Montgomery McCracken Walker & Rhoads LLP, New York, NY, *for Defendants-Appellees Conti 11 Container Schiffahrts-GmbH & Co. KG MS MSC "Flaminia" and NSB Niederelbe Schiffahrtsgesellschaft mbH & Co. KG.*

EDWARD P. FLOOD (Jon Werner, Martin R. West II, *on the brief*), Lyons & Flood, LLP, New York, NY, *for Defendant-Appellee MSC Mediterranean Shipping Company S.A.*

———————

CARNEY, *Circuit Judge*:

Deltech Corp. ("Deltech"), a chemical manufacturer, joins here with Stolt-Nielsen USA, Inc., and Stolt Tank Containers B.V. (together, "Stolt"), a shipping concern, to challenge the district court's determination that they alone bear liability for damages caused by an explosion and fire that took place in June 2012 aboard the ocean-going vessel M/V MSC Flaminia. Two weeks into the Flaminia's trip from New Orleans Terminal across the Atlantic, toward Belgium, three tanks of 80% grade of the chemical divinylbenzene (DVB-80)—manufactured by Deltech and shipped by Stolt—exploded. The explosion and ensuing fire killed several members of the ship's crew, injured others, and damaged the ship and its cargo.

In the first phase of a three-part proceeding in the United States District Court for the Southern District of New York (Forrest, *J.*), the district court addressed the causes of the explosion. It determined that the conditions in which the tanks of DVB-80 were kept at New Orleans Terminal and then stowed onboard were two of the primary causes of the explosion. Together, these conditions resulted in the chemical undergoing a process known as auto-polymerization; this in turn caused the tanks to emit a cloud of vapor that ultimately ignited and exploded when the crew's firefighting efforts generated a fateful spark. *See In re M/V MSC FLAMINIA*, No. 12-cv-8892, 2018 WL 526549 (KBF), at *30-31 (S.D.N.Y. Jan. 23, 2018) ("*Phase I*").

In the second phase, the district court addressed the parties' respective liability for cargo loss and damage. (Separately, claims for death and bodily injury had largely been settled.) The district court found Deltech and Stolt, together, wholly responsible

7

for the cargo losses: Deltech, at a 55% level, and Stolt, at 45%. *In re M/V MSC FLAMINIA*, 339 F. Supp. 3d 185, 229–30 (S.D.N.Y. 2018) ("*Phase II*"). As detailed below, it exonerated other parties to the shipping transaction. It is the latter rulings that Deltech and Stolt challenge in this interlocutory appeal.[1] In a third phase and final phase, the court will award damages. *Id.* at 191.

On review, we affirm in part and reverse in part. We AFFIRM the district court's ruling that Deltech and Stolt are liable for the explosion's resulting damages under a failure-to-warn theory pursuant to Section 4(3) of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 (note); we REVERSE, however, the district court's determination that Deltech and Stolt are strictly liable for the damages under Section 4(6) of COGSA. We also AFFIRM the district court's conclusion that the carrier and related shipowner interests—MSC Mediterranean Shipping Company S.A. ("MSC"), Container Schiffahrts-GMBH & Co., KG MSC "FLAMINIA" ("Conti"), and NSB Niederelbe Schiffahrtsgesellschaft MBH & Co. KG ("NSB")—were not negligent in relation to the shipment, and that New Orleans Terminal too was not negligent. We also AFFIRM the district court's determination that Stolt has not stated a claim against its subcontractor, the documentation provider BDP International, Inc. ("BDP"): we agree that Stolt failed to show that BDP's breach in processing the shipment's waybill was a contributing cause of the damages. Finally, we AFFIRM the district court's determination that MSC, Conti, and NSB are entitled to indemnification for their losses by Stolt and Deltech.

---

[1] The courts of appeals generally have jurisdiction over appeals from "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3).

# BACKGROUND[2]

On July 1, 2012, the Flaminia departed New Orleans Terminal, loaded with cargo and bound for Antwerp, Belgium. Fourteen days into its journey across the Atlantic, a major explosion occurred in one of its holds, causing the tragic deaths of several crew members, serious bodily injury to others, and substantial damage to both the ship and the cargo of numerous shippers.

Phase I of the court proceedings regarding the resulting losses examined the conditions in which Deltech's DVB-80 was manufactured and shipped and considered the physical cause or causes of the explosion. After an extensive bench trial, the district court, by a preponderance of the evidence, concluded that a spark that ignited a cloud of vapor rising from three tanks of DVB-80 stored in one of the Flaminia's holds—Hold 4—caused the explosion. The spark was generated by the crew in their efforts to fight what they perceived to be a fire in that hold. The cloud of vapor, in turn, was the result of DVB-80 undergoing a chemical process called auto-polymerization and reaching thermal runaway. When DVB-80 auto-polymerizes, it can be dangerous because the reaction generates heat and is self-perpetuating.

In Phase II, the district court considered liability for the explosion, fire, and physical damage. The district court explained that the DVB-80 onboard the Flaminia was manufactured by Deltech in its Baton Rouge, Louisiana, plant. Stolt—Deltech's regular non-vessel operating common carrier ("NVOCC")[3]—made shipping

---

[2] Unless otherwise noted, the facts set forth in this background section are drawn from the district court's two thorough opinions. We note any relevant disagreements among the parties.

[3] As the district court explained, "Stolt played two roles with regard to the DVB cargo at issue here. First, it acted as an NVOCC, and in that capacity was Deltech's shipping agent and arranged for transport aboard the Flaminia. Stolt also arranged for truck transport . . . from Deltech to [New Orleans Terminal]." *Phase II*, 339 F. Supp. 3d at 205. NVOCCs "typically assist

arrangements for the DVB-80 on behalf of Deltech. To enable the shipment, it provided three large shipping tanks (also known as "ISO containers"),[4] which were filled with the DVB-80 at the Baton Rouge plant. Stolt also procured space for the shipment aboard an ocean-going vessel; arranged for a trucker to transport the tanks to a suitable shipping terminal; and was responsible for certain aspects of documenting the shipment. Applying a preponderance of the evidence standard, the district court found Deltech and Stolt together exclusively liable for the damages that resulted when the shipped DVB-80 exploded both under a strict-liability theory (in the COGSA regime) and under a failure-to-warn theory (also in the COGSA regime), with damages for the lost and damaged cargo to be apportioned in the projected Phase III. *See Phase II*, 339 F. Supp. 3d at 194–95.

In contrast, the district court found appellees not liable for the losses. Appellees are primarily other parties who had a role in delivering the DVB-80 shipment to Deltech customers in Antwerp. Key among them are:

- **MSC Mediterranean Shipping Company S.A.** ("MSC"): the charterer of the Flaminia;
- **Conti 11 Container Schiffahrts-GMBH & Co., KG MSC "FLAMINIA"** ("Conti"): the owner of the Flaminia;
- **NSB Niederelbe Schiffahrtsgesellschaft MBH & Co. KG** ("NSB"): the operator of the Flaminia;

---

a cargo shipper with making necessary arrangements for the booking of any pre-carriage (such as transport by truck to an ocean terminal), as well as the booking for ocean carriage. Ocean carriage is provided by a 'vessel operating common carrier' who either owns a vessel outright or charters space on vessels for the transportation of cargo. NVOCCs are middlemen acting between the shipper and the ocean carrier." *Id.* at 205 n.31.

[4] "ISO containers" are large shipping containers meeting standards set by the International Organization for Standardization ("ISO"). *See* https://www.iso.org/home.html (last visited June 29, 2023).

- **Chemtura Corp.** ("Chemtura"): the owner and shipper of the chemical, diphenylamine ("DPA"), which was stored at high temperatures on the Flaminia in tanks next to the DVB-80 containers;[5]
- **BDP International, Inc.** ("BDP"): a Stolt subcontractor that prepared shipping documents for the three DVB-80 tanks and was the subject of a contract claim by Stolt;
- **New Orleans Terminal** ("the Terminal" or "NOT"): where a trucker retained by Stolt delivered Deltech's DVB-80 to await loading onto the Flaminia.

In the Phase I and II proceedings, the parties asserted many claims and counterclaims, as the district court ably described, discussed, and resolved in its comprehensive prior opinions. Only the following five are before us now:

(1) <u>Strict liability</u>: Was the district court correct in concluding that both Deltech and Stolt are strictly liable to Conti and NSB under COGSA?

(2) <u>Failure-to-warn negligence</u>: Did the district court err in concluding that both Deltech and Stolt are liable to Conti and NSB under a failure-to-warn negligence theory pursuant to COGSA?

(3) <u>Non-negligence of carrier interests</u>: Did the district court err in finding that MSC, Conti, and NSB (these three together, the "carrier" interests) did not act negligently and therefore do not bear partial responsibility for the losses?

---

[5] In a Nondispositive Stipulation dated April 27, 2020, Stolt and Deltech withdrew their respective appeals insofar as they renewed claims against defendants-counter-claimants-appellees Chemtura Corporation, Chemtura Italy S.R.L., and Chemtura Europe GmbH, and third-party defendant-appellee Rubicon, LLC (collectively, the "Chemtura Appellees"). *See* Order, Dkt. 376, *In re M/V MSC Flaminia*, No. 18-2974 (2d Cir. Apr. 28, 2020).

(4) <u>Breach of contract claim</u>: Did the district court err in ruling that Stolt's breach of contract claim against BDP is not actionable?

(5) <u>Indemnification</u>: Did the district court err in concluding that Stolt and Deltech breached the Sea Waybills and must indemnify MSC, Conti, and NSB for their losses?

In answering these questions, we adopt the district court's uncontested description of the setting for the applicable legal regimes:

> This action concerns claims based on contracts for the carriage of goods by sea and torts that occurred at sea. As such, the contracts at issue are maritime contracts and the torts are maritime torts within the admiralty jurisdiction of the Court pursuant to 28 U.S.C. § 1333(1). And with admiralty jurisdiction comes the application of substantive admiralty law. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies.

*Phase II*, 339 F. Supp. 3d at 229 n.91 (alterations, citations, and internal quotation marks omitted). Various additional statutory and international regulatory regimes also bear on the parties' claims. We discuss those below as they become relevant.

To enable us to address the liability arguments, we turn first to a more in-depth review of the accident's causation as determined by the district court.

## I. The Properties of DVB-80

DVB-80 is a chemical compound that is used in water purification. When exposed to heat, DVB-80 molecules can become unstable, causing them to react, link together, and form a polymer chain. This bonding of two or more simple molecules to form larger molecules with repeating structural units is called polymerization. When DVB-80 polymerizes, it releases heat. The polymerization process can thus become self-sustaining and can even accelerate without the addition of any more heat. That phenomenon is called auto-polymerization.

12

When the heat generated by DVB-80's polymerization exceeds the heat that the reaction loses to the environment, the rate of polymerization increases exponentially, and the reaction is said to have reached "thermal runaway." *Phase I*, 2018 WL 526549 at *8. At that stage, the temperature increases rapidly, building pressure in any tank in which it is stored. Eventually, any pressure-release valve found on the tank starts to vent a white vapor resembling the smoke that is generated by an ordinary fire. Unlike ordinary smoke, however, the cloud resulting from DVB-80 in thermal runaway can explode in certain conditions if exposed to an ignition source and a specific amount of oxygen.

When it stores DVB-80, Deltech uses an additive called p-tert-butylcatechol (commonly known as "TBC") to inhibit polymerization. *See Phase II*, 339 F. Supp. 3d at 196. TBC, combined with the oxygen that is dissolved in the liquid DVB-80 and that is inside empty storage tanks, impedes polymerization, making DVB-80 relatively safe for transport in tanks, at least under ordinary conditions. Even TBC-treated DVB-80 is heat-sensitive, however. A storage tank's exposure to heat causes its contents to consume oxygen more quickly and reduces TBC's effectiveness. Like untreated DVB-80, then, TBC-treated DVB-80 requires careful "handling and storage" at each step of transport and delivery. *Id.* at 200. Deltech developed its shipment protocols accordingly, and then in 2006, not long after it had begun shipping its DVB-80 overseas, it refined its protocols after a few of its shipments underwent auto-polymerization. *Id.* at 197.[6]

_____

[6] Deltech experienced two auto-polymerization incidents involving overseas shipments of DVB-80 in 2006. *Phase II*, 339 F. Supp. 3d at 197. It also had five other shipments with "polymerization issues" that year, but the district court found that those incidents were not analogous to the incident aboard the Flaminia. *See Phase I*, 2018 WL 526549, at *16 (finding only the "Chauncy" and "Grangemouth" incidents "useful" and "support[ing] the view that the Flaminia DVB80 cargo would have completed the voyage safely under normal conditions").

In 2012, when it engaged Stolt to handle the Antwerp-bound shipment, Deltech protocols included: (1) generally shipping from the Port of New York (Newark) during the summer months, when temperatures at New Orleans Terminal, which is nearest to the Deltech plant, are especially high; and (2) avoiding exposure of tanks filled with DVB-80 to more than 15 to 20 days of average external temperatures between 75 to 85 degrees Fahrenheit. One Deltech employee explained that shipping from Newark in the summer months offered three important safety advantages: "(1) a cooler port of departure, (2) therefore cooler temperatures preceding vessel loading (*e.g.*, at the terminal), and (3) a shorter ocean voyage." *Id.* at 201. Confirming that statement, data cited by the district court showed that "the maximum number of days in transit from [New Orleans Terminal] to Antwerp is 31 days, with a median of 16; from Newark, the maximum days in transit is 13 days with a median of 9.5." *Id.* at 197.

## II.    The DVB-80 Shipment Loaded onto the Flaminia

In March or April 2012, Deltech made what the district court called the "fateful decision" to make at least one shipment of its DVB-80 to customers in Europe from New Orleans Terminal, contrary to its protocols. *Id.* at 201–02. Either intentionally, or (as alleged by Deltech) because of an internal "miscommunication," Deltech slated the Antwerp shipment at issue here to be sent from New Orleans Terminal in June. *Id.* at 210.

On June 8, 2012, Deltech requested that Stolt make the arrangements for the shipment, and Stolt duly began to do so. On June 11, Stolt sent Deltech its booking confirmation and contacted MSC to reserve space aboard a suitable vessel.

On June 21, Stolt supplied Deltech with three ISO tanks for the shipment, and Deltech personnel filled the tanks with Deltech's TBC-treated DVB-80 later that day. Under Stolt's direction, the tanks were then trucked to New Orleans Terminal that same

day.[7] And there, for about ten days, they sat on the dock, in direct sunlight and in average ambient temperatures of 85 degrees Fahrenheit and a high of 96–98 degrees.

Finally, on July 1, they were loaded onto the Flaminia along with the ship's other cargo. The Deltech tanks were stored below deck in Hold 4, which was flanked by the ship's wing tanks holding heated fuel oil. The tanks also sat alongside three heat-producing containers of the chemical DPA, manufactured and shipped by Chemtura.

The Flaminia departed New Orleans at 10:00 a.m. on July 1. Two weeks later, on July 14, while the vessel was at sea, the three DVB-80 tanks exploded and a firestorm erupted. By then, Deltech's DVB-80 shipment had been in transit from the Baton Rouge factory for a total 23 days, many of them—if not all—in hot conditions.

## III.    Warnings About Handling DVB-80

In preparation for the shipment, Deltech, Stolt, and BDP created several different documents that served as contracts among the parties to the shipment, guidance for the treatment of the shipment, or sometimes both. The documents were also used to arrange and track the tanks' transport and manage their safety. Each contained some kind of warning and instructions related to the safe handling of DVB-80.

<u>June 8 Booking Request</u>: Deltech's June 8 booking request to Stolt included the following brief specifications: (1) "Please secure a booking with temperature monitoring to load DVB 80%"; (2) "Container to be stowed 'in stack' or below deck to avoid exposure to direct sunlight. Do not stow near heat sources[]"; and (3) "If container is

---

[7] The record suggests that the tanks were filled and left Baton Rouge for New Orleans Terminal earlier than expected because of some unforeseen circumstances, including an emergency medical need of a Deltech employee. *See Phase II*, 339 F. Supp. 3d at 215–16.

greater than 27 C, the Iso-Container cannot be shipped." *Phase II*, 339 F. Supp. 3d at 202 n.17.

       <u>Straight Bill of Lading & Material Safety Data Sheet</u>: Deltech developed and used a Straight Bill of Lading, which it gave to Boasso, the trucking concern Stolt engaged to transport the filled tanks to New Orleans Terminal. The Straight Bill of Lading advised: "SEE ATTACHED MATERIAL SAFETY DATA SHEET FOR EMERGENCY RESPONSE INFORMATION. PRODUCT IS HEAT SENSITIVE! DO NOT APPLY HEAT TO CONVEYANCE DURING TRANSIT. IF PRODUCT TEMPERATURE EXCEEDS 100°F, CONTACT DELTECH IMMEDIATELY." *Id.* at 203 n.22.

       With the Straight Bills of Lading, Deltech gave Boasso a Material Safety Data Sheet. Of all of the Deltech shipping documents, this contained the most detailed and explicit instructions and warnings about DVB-80. It provided: "Closed containers of DVB (80%) may build up explosive pressures when exposed to the heat of fires. Closed containers of DVB (80%) exposed to heat may begin to polymerize in an exothermic manner leading to auto acceleration and rapid pressure increase and explosion potential." *Id.* The Material Safety Data Sheet also directed stowage in a "cool area or refrigerated tank away from high temperatures, hot pipes or direct sunlight" and cautioned the shipper to "[a]void excessive heat and keep away from open flames or ignition sources." *Id.* It further instructed the shipper to "[m]aintain temperature below 80°F (27°C)." *Id.* Stolt also received the Material Safety Data Sheet but, the district court found, Stolt did not enter the warnings it contained into Stolt's internal information systems.[8]

---

[8] *See Phase II*, 339 F. Supp. 3d at 208 ("A significant gap in Stolt's internal procedures, and causally linked to the incident here, was its failure to populate the AS/400 database with sufficient information regarding handling DVB80 during transport as to product characteristics.

Boasso provided the Straight Bills of Lading and Material Safety Data Sheet to the management of New Orleans Terminal. Terminal management testified that it did not transmit the documents to MSC,[9] however, and that it had "filed [them] away" by the time the DVB-80 tanks were loaded onto the Flaminia. *Id.* at 220.[10] This, however, was not a departure from any ordinary protocol: the district court found that the Terminal stores cargo simply according to the information associated with the cargo's internationally recognized UN number and class.[11] All "Class 9" cargo,[12] such as the DVB and DPA, "are treated similarly and interchangeably for storage in the yard." *Id.* at 221.

_____

. . . Information from the [Material Safety Data Sheet] was thus rendered irrelevant, and that irrelevancy was carried forward into future cargo shipments.").

[9] MSC is a partial owner of New Orleans Terminal, but the entities' roles here are separate. *See Phase II*, 339 F. Supp. 3d at 220-21 (explaining that New Orleans Terminal is responsible for processing and storage at the Terminal, whereas MSC is responsible for stowage aboard the vessel).

[10] Thus, neither the Straight Bills of Lading nor the Material Safety Data Sheet ever reached MSC.

[11] The UN number is part of an international tracking convention overseen by the United Nations and in widespread use. UN numbers convey categorical information about the nature of a shipment. *Phase II*, 339 F. Supp. 3d at 199. Similarly, the International Maritime Dangerous Goods ("IMDG") Code categorizes dangerous goods into classes based on the type of risk presented by the goods. The Convention for the Safety of Life at Sea ("SOLAS"), which has been ratified by the United States, incorporates the IMDG Code by amendment. *See In re M/V DG Harmony*, 533 F.3d 83, 88 (2d Cir. 2008)**.** SOLAS provides that the "carriage of dangerous goods in packaged form shall be in compliance with the relevant provisions of the IMDG Code." *Phase II*, 339 F. Supp. 3d at 199 (quoting SOLAS, Ch. VII, Reg. 3 (5th ed. 2009)).

[12] Class 9 is used to identify "miscellaneous and environmentally hazardous" substances. *Phase II*, 339 F. Supp. 3d at 199. DVB-80 is a Class 9 substance; its UN number is UN 3082. The IMDG Code does not require UN 3082 items to be stowed at a distance from any other substances or from the vessel structure, nor does it require ventilation when the cargo is stowed below deck. *Id.* at 233.

Express Bill of Lading Instructions, Master Bill of Lading Instructions & Sea
Waybills: Deltech provided "Express Bill of Lading Instructions" to its freight
forwarder, Panalpina,[13] as well as to BDP**.** BDP was charged with using the Express Bill
of Lading Instructions to create "Master Bill of Lading Instructions" ("MBLI") for the
vessel charterer (MSC). MSC, in turn, was expected to use the MBLI to draft Sea
Waybills,[14] which would govern the relationship between Stolt, Deltech, MSC, and
MSC's subcontractors, Conti and NSB.

Deltech's Express Bill of Lading Instructions called for the following warnings to
be included on the MBLI: "DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE
DECK FOR TEMPERATURE MONITORING." *Id.* at 203-04 n.23.[15] The MBLI that BDP
sent to MSC included the heat warning, and BDP was expected to ensure that MSC
reproduced the warning on its Sea Waybills. The draft Sea Waybills then created by
MSC, however, and ostensibly based on the MBLI, omitted this warning.

Dangerous Goods Declarations: Finally, Stolt prepared and sent draft and final
versions of Dangerous Goods Declarations ("DGDs") to MSC, disclosing certain safety
information regarding DVB-80's dangerous characteristics. The DGDs contained the
UN code and class number for DVB-80—UN 3082, class 9—which identified the cargo

---

[13] A freight forwarder facilitates the movement of cargo and assists in processing a client's
export and import documentation related to shipments being transported under arrangements
made by a common carrier, either a non-vessel operating common carrier ("NVOCC") or a
vessel-operating common carrier. *See* 46 U.S.C. § 40102(19); *Prima U.S. Inc. v. Panalpina, Inc.*, 223
F.3d 126, 129 (2d Cir. 2000).

[14] A sea waybill is a nonnegotiable contract of carriage. *See Royal & Sun All. Ins., PLC v. Ocean
World Lines, Inc.*, 612 F.3d 138, 141 n.3 & n.5 (2d Cir. 2010); *see also* 1 T. Schoenbaum, 1 Admiralty
& Mar. Law § 10:11 (6th ed. 2022).

[15] This of course was in tension with the booking request instructions from Deltech to Stolt,
requesting temperature monitoring but asking for either in-stack or below-deck stowage to
avoid direct sunlight. *See Phase II*, 339 F. Supp. 3d at 202 n.17.

as an environmentally hazardous substance and implied a general need for care. The DGDs gave no additional warnings or instructions. *Id.* at 214–15.

## IV. The Explosion

At approximately 5:42 am on July 14, 2012, the smoke alarm sounded on the Flaminia. Hold 4 was identified as the trigger for the alarm. The ship's Chief Officer deployed a system designed to suppress a fire by releasing $CO_2$ into the hold. At three times between 6:42 am and 8:06 am, the crew released $CO_2$ into Hold 4, where Deltech's DVB-80 tanks were stored. A few minutes after the third release, a small explosion occurred. A "large amount of dense black smoke" and flames were then seen billowing from the direction of Hold 4, according to one witness. *Phase I*, 2018 WL 526549, at *28. The district court determined by a preponderance of evidence that one of the crew's actions—either opening the man-lid entrance to Hold 4 or inserting firehoses to send water into the hold—created a spark that ignited the vapor in Hold 4 and triggered the primary, deadly explosion.

## V. The District Court's Findings

### A. Phase I: Conclusions on Causation

Based on evidence presented at the Phase I trial, the district court reached several conclusions. Preliminarily, it found no deficiencies in Deltech's manufacturing process or the process of loading the tanks of DVB-80 aboard the Flaminia. It determined that the DVB-80 was adequately oxygenated while the three tanks were being filled, and that the DVB-80 contained more than enough TBC to "ensure complete inhibition" of polymerization on a typical voyage. *Id.* at *8 n.13. Because the chemical was "sufficiently oxygenated and chilled," the district court estimated that "under normal transit time and temperature conditions," it would have arrived safely in Antwerp. *Id.* at *12.

19

It then concluded that each of the following was a "substantial contributing factor" to the DVB-80's auto-polymerization and the subsequent explosion:

[1] The decision to ship the DVB-80 out of NOT, which necessitated a longer voyage than would have a more northeastern port and exposed it to undesirable conditions;

[2] The fact that the DVB-80 was left still on the dock at NOT for 10 days in the sun, in hot weather, and next to a number of tanks of heated DPA;

[3] The placement of the DVB-80 in Hold 4, where it was stored next to containers of heated DPA and near the ship's heated fuel tanks; and

[4] The lack of proper ventilation, leading to hotter-than-typical ambient temperatures in Hold 4.

*Id.* at *30–31 (footnote omitted).

B.     Phase II: Conclusions on Responsibility

In its Phase II decision, the district court determined that Deltech bore the greatest responsibility for the explosion. *See Phase II*, 339 F. Supp. 3d at 194. It pointed to two critical decisions made by Deltech in conflict with its preexisting safety protocols. First, Deltech authorized shipment of DVB-80 to be made from New Orleans in late June. *Id*. Second, it authorized filling the ISO containers several days earlier than necessary for the expected embarkation date of June 30 or July 1, "resulting in the containers sitting stagnant in the hot New Orleans sun." *Id.* In the district court's estimation, these two decisions "were by far the most critical." *Id.* On this basis, it assigned Deltech 55% liability on both strict liability and failure-to-warn theories.

The district court additionally found that Stolt, as Deltech's NVOCC dealing with the many parties to the shipment, was liable for the losses under a strict liability theory, for failure-to-warn, for general negligence, and because it breached its contractual obligations to several parties. *Id.* at 194–95. Stolt possessed "extensive information regarding the heat-sensitive nature of [DVB-80]," the court found, but it

failed to share that information with MSC, the vessel charterer. *Id.* at 195. It also failed to share with MSC the information that the ISO containers of DVB-80 had been filled early and then sat in the sun for days in advance of loading. The district court found that Stolt bore responsibility for the early loading of the DVB-80 into the tanks, for arranging for early transport to New Orleans Terminal, and for leaving the tanks to sit in the open air at NOT. *Id.*

The district court found that BDP, Stolt's documentation agent, bore no liability for damages. Although it found that BDP failed to meet its contractual obligation to Stolt to "ensure certain information was contained on the Master Bill of Lading Instructions," the district court determined that the breach did not lead to any loss because "no participant in the chain of events would have acted on the information BDP failed to include." *Id.*

MSC (the vessel's time charterer) was also not liable, the district court ruled, because MSC lacked sufficient information about the conditions that the tanks of DVB had been exposed to pre-shipment. Rather, MSC acted in accordance with "industry practice, its [own] prior practices, and the reasonable (versus unreasonable) expectations of the parties," the district court decided. *Id.* Further, "MSC's [on-board] stowage plan was consistent with industry practice and reasonable under normal circumstances." *Id.* Absent more specific warnings—and none were provided by Stolt—MSC acted reasonably.

The district court found that Conti (the ship owner) and NSB (the ship operator) bore no legal responsibility for the disaster. Conti provided a seaworthy vessel, the court ruled, and NSB's crew was properly trained. The crew's reaction to the smoke in Hold 4—speedily mounting efforts to fight what they understood to be a fire in the hold—was reasonable even if in doing so the crew inadvertently sparked the main explosion. *Id.* at 195–96. Additionally, Chemtura—the shipper of the DPA cargo that

was stored next to Deltech's DVB-80 tanks—bore no responsibility for any losses, the court ruled. *Id.* at 196. Chemtura managed its shipment according to protocol.

Finally, the district court determined that MSC, Conti, and NSB were entitled to full indemnification from Stolt and Deltech. *Id.* at 245. Under the Sea Waybills' "dangerous goods clause" (Clause 15), Stolt and Deltech had an obligation to "fully inform the Carrier"—MSC—"in writing of the precise and accurate details" of dangerous goods as well as any "special precautions or handling required" for their transport. *Id.* Stolt and Deltech breached that obligation, the court found, and therefore were required under the Sea Waybills' dangerous goods clause to indemnify MSC and its subcontractors—Conti, and NSB—for their damages arising from the transport of DVB. *Id.* at 245–46.

This appeal followed.

## DISCUSSION

After a bench trial, we review the district court's findings of fact for clear error and conclusions of law *de novo*. *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 297 (2d Cir. 2009). Because rulings on negligence are ultimately conclusions of law, the rule in this circuit has long been to consider them *de novo*. *See Ching Sheng Fishery Co. v. United States*, 124 F.3d 152, 157 (2d Cir. 1997) ("[U]nder the decisions of this circuit, a district court's finding on the issue of negligence—as distinguished from the evidentiary facts on which the finding is based—is not entitled to the benefit of the 'unless clearly erroneous' rule, but instead is reviewed *de novo*."); *see also Payne v. United States*, 359 F.3d 132, 135 (2d Cir. 2004) (describing this circuit's "long-held" rule of *de novo* review for negligence determinations). While this rule has been met with "nearly unanimous disagreement by the other circuits and commentators," in practice it is "not so different" from the other circuits' more deferential standard of review. *In re City of New*

*York*, 522 F.3d 279, 282 (2d Cir. 2008); *cf. Payne*, 359 F.3d at 137 (remarking that we have "severely undercut our rule over the years"). Indeed, because the determination of negligence is "so bound up with the specific and complex facts of each individual case," we will not disturb a district court's negligence finding unless it "manifests an incorrect conception of the applicable law." *In re City of New York*, 522 F.3d at 282 (internal quotation marks omitted). Even in this circuit, "the question of the existence of negligence . . . has become primarily one for the factfinder to determine." *Payne*, 359 F.3d at 137. We have explained that this is because "the issue today is only very rarely whether the trial court has applied the correct *legal* standard. For, under present law, such standards are . . . unlikely to be determinative." *Id.* Instead, the issue is typically whether the defendant exercised appropriate conduct and behaved how a "reasonable person" ought to have behaved given the specific facts and circumstances of the individual case. *Id.* Thus, even where the question involves a legal judgment about what a party reasonably ought to have known, "a fact-sensitive, 'calibrated' analysis" is appropriate. *DG Harmony*, 533 F.3d at 95. These principles hold when we exercise our maritime jurisdiction as well. *See id.*

While negligence is ultimately a legal determination, "[a]ttributions of fault among the various parties are considered factual determinations and therefore are reviewed under the clearly erroneous standard." *Contship Containerlines, Ltd. v. PPG Indus., Inc.*, 442 F.3d 74, 77 (2d Cir. 2006) (citing *Ching Sheng Fishery*, 124 F.3d at 157 ("A district court's finding on issues of causation and on its allocation of fault among negligent parties continues to be subject only to clearly erroneous review.")).

### I.  No Strict Liability Recovery Against Stolt and Deltech

The district court held that Stolt and Deltech were strictly liable for the loss arising from the explosion aboard the Flaminia. The district court took great care with its factual rulings in this difficult case; this legal determination, however, was error.

The Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 (note), applies to all contracts for carriage of goods by sea.[16] It thus governs the relationships of at least some of the parties before us.

As most relevant here, COGSA provides that a "shipper" of "inflammable, explosive, or dangerous" goods "shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment" when the "carrier" does not have knowledge of the "nature and character" of the goods. COGSA § 4(6); *see DG Harmony*, 533 F.3d at 92–94 (applying COGSA's strict liability provision); *Senator Linie Gmbh & Co. KG v. Sunway Line, Inc.*, 291 F.3d 145, 168–70 (2d Cir. 2002) (same).[17] Strict liability will not attach to the shipper, however, when the carrier knows that a particular type of cargo in its charge is dangerous. *See DG Harmony*, 553 F.3d at 93 (holding that "notice of *any* aspect of the cargo's dangerousness" is sufficient to defeat the carrier's ability to recover in strict liability (emphasis added)).[18] There is no dispute

---

[16] COGSA was published at 46 U.S.C. app. §§ 1300–1315 until 2006, when it was recodified at 46 U.S.C. § 30701 (note). For clarity, we refer to COGSA's sections as they appear in the recodification, which mirrors the section numbering used in the original statute. *See* An Act of Apr. 16, 1936, ch. 229, §§ 1-16, 49 Stat. 1207.

[17] Section 4(6) is an exception to COGSA's general rule requiring proof of negligence for shipper liability. *See* 46 U.S.C. § 30701 (note) § 4(3) ("The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants."); *see also Contship Containerlines*, 442 F.3d at 78.

[18] This principle does not convey that *no* liability will attach to the shipper, of course; it is only to highlight that the special rules of strict liability will not apply when the carrier has sufficient notice of the nature of the cargo. *See Contship Containerlines*, 442 F.3d at 77 (explaining that a carrier with general knowledge of a cargo's dangerousness may "ultimately prevail [] depending on the particulars of what it and the shipper knew and their respective duties" even if it is prevented from prevailing on strict liability).

here that MSC, as the charterer of the vessel, is a "carrier" under COGSA. The question is whether Stolt and Deltech are strictly liable.

The district court reasoned that "generalized knowledge regarding a type of cargo" and its dangerousness is insufficient to warn of its "*particular* contents and chemical sensitivities." *Phase II*, 339 F. Supp. 3d at 240 (emphasis added). Because MSC could not have known that the DVB-80 stored in the tanks it loaded onto the Flaminia had been exposed to the specific dangerous conditions that we have described, the court ruled that Deltech and Stolt both were strictly liable to MSC for the loss.

As we held in *Contship Containerlines*, however, a carrier's entitlement to recovery in strict liability requires overcoming a very high hurdle: "[A] carrier cannot invoke strict liability if it knows that a cargo poses a danger and requires gingerly handling or stowage, and nevertheless exposes the cargo to the general condition that triggers the known danger, regardless of whether the carrier is aware of the *precise characteristics* of the cargo." 442 F.3d at 77 (emphasis added). Thus, recovery on a strict liability theory is unavailable to a party with "notice of the general dangerousness" of the cargo it agreed to transport. *DG Harmony*, 533 F.3d at 93. The strict liability analysis is "binary," *Contship Containerlines*, 442 F.3d at 77, and the notice threshold is relatively modest: the carrier's knowledge can be "incomplete" or reflect an "underestimation of the danger" and yet still preclude recovery in strict liability, *DG Harmony*, 533 F.3d at 94.

Here, MSC did not have specific knowledge of the conditions to which the DVB-80 tanks were exposed at New Orleans Terminal. It did, however, have prior experience shipping DVB-80, and MSC was aware, at least at the corporate level, that DVB-80 generally was heat sensitive. In particular, the record showed that MSC had shipped DVB-80 cargo many times before June 2012 and had received transport documents, including other DGDs and Straight Bills of Lading, that warned of the chemical's heat sensitivity. The manager of MSC's Dangerous Cargo Department conceded that he,

"and therefore MSC," had previously "reviewed information that DVB should not be loaded onto a vessel if [its] temperature was above 27 [degrees Celsius]." *Phase II*, 339 F. Supp. 3d at 219 (internal quotation marks omitted).[19]

On this record, in our view it was incorrect to conclude broadly that MSC was not on notice as to "any aspect of the cargo's dangerousness." MSC's experience with DVB-80 and its management's general knowledge of the chemical's heat sensitivity surpasses the low threshold that precludes a recovery in strict liability. Our holding closely aligns with our conclusion in *DG Harmony* that recovery in strict liability was not available where the ship-owning interests did not know "the precise characteristics of the cargo, but they knew that [the cargo] was an unstable substance that became vulnerable to combustion when heated . . . [and] exposed [the cargo] to the general condition—heat—that induces such combustion." 533 F.3d at 93 (internal quotation marks omitted).

For reasons explained below, however, the district court correctly concluded that MSC's high-level knowledge of DVB-80's dangerousness was not sufficient to establish that the carrier was negligent in its stowage and handling of the specific tanks of DVB-80 aboard the Flaminia. We turn to that issue in Part III.

_____

[19] At oral argument, counsel for MSC acknowledged that MSC had knowledge of the general characteristics of DVB—including that the chemical "can polymerize if exposed to heat over time." Oral Argument at 21:53–22:12. Counsel advised that it was instead "the degree of danger that MSC didn't know about." *Id.* This is not enough to create an entitlement to strict liability recovery.

## II. Negligent Failure to Warn by Stolt and Deltech

The district court determined that Stolt and Deltech were liable to Conti and NSB for losses caused by the explosion under a negligent failure-to-warn theory in the COGSA regime.[20] We agree.

Under COGSA's general rule of shipper liability, a "shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants." 46 U.S.C. § 30701 (note) § 4(3). We have recognized that "[a] shipper's failure to adequately inform a carrier of the foreseeable dangers posed by cargo can constitute" such "fault[] or neglect" and may give rise to a negligent failure-to-warn claim. *Contship Containerlines*, 442 F.3d at 78. To prevail on this type of claim, a "plaintiff must show that the shipper had a duty to warn because the cargo presented dangers about which the carrier could not reasonably be expected to know." *DG Harmony*, 533 F.3d at 94; *see also Contship Containerlines*, 442 F.3d at 78. That showing, in turn, depends on whether it "would have been reasonable to expect the carrier to know of the *specific type and degree of danger* posed by the cargo at issue." *DG Harmony*, 533 F.3d at 95 (emphasis in original). Generally, the shipper is in the best position to know of the relevant dangers and to provide an effective warning; absent prior or independent knowledge of the

---

[20] The district court also determined that Chemtura was not negligent in its shipping of DPA and therefore not liable for damages here because it did not have a duty to warn that its containers of DPA had been heated as part of its fill and loading process. Chemtura labeled the DPA according to the IMDG Code, and it was not reasonably foreseeable to Chemtura that the DPA would be stored next to containers of DVB-80 that, as here, had been exposed to unusual conditions making those containers particularly sensitive to heat. *See Phase II*, 339 F. Supp. 3d at 236-37. For the reasons stated by the district court, *id.* at 223-24, we too conclude that Chemtura was not negligent in its labelling of the containers of DPA. After withdrawing their appeals with respect to claims against Chemtura, however, neither Deltech nor Stolt presses for contribution from Chemtura. *See supra* n.5.

nature of the cargo or the particular shipment, the carrier is entitled to rely on the warnings given by the shipper without conducting further inquiries. *See DG Harmony*, 533 F.3d at 95 (explaining that when the dangerousness of cargo is not readily apparent, "a carrier may rely on the shipper's attestations as to the cargo's characteristics" because carriers and their agents "often must make quick and complex stowage decisions about diverse containerized cargoes" and therefore should not be expected to have "encyclopedic knowledge beyond" those attestations (citation omitted)).

Consistent with the principles enunciated in *DG Harmony*, the district court correctly concluded that Stolt and Deltech bore a duty to warn of the "particular heat sensitivities of the DVB[-80]" in the tanks loaded onto the Flaminia. *Phase II*, 339 F. Supp. 3d at 239. Under the circumstances presented here, it would have been unreasonable to expect MSC, Conti, and NSB either together or individually to know of the specific type and degree of danger posed by this cargo of DVB-80. The risk-producing circumstances—the early filling of the tanks and the long period outside in the heat at NOT, in particular—were neither apparent on visual inspection nor described in the tanks' accompanying documentation.

Further, Stolt and Deltech each had material information about the DVB-80 tanks that neither communicated to MSC. In particular, Deltech informed Stolt of the dangerous nature of generic DVB-80 but failed to ensure that the information was shared with each party in the shipping process chain. Deltech also "failed to effectively ensure that the necessary monitoring, including checking the temperature prior to loading, would occur." *Id.* at 237. As for Stolt, the district court concluded that Stolt did not warn other players of the dangers of a generic DVB-80 cargo or of this shipment in particular: Stolt gave no hint to MSC that the tanks of DVB-80 onboard the Flaminia had been delivered early to New Orleans Terminal and sat there day after day, exposed to the sun.

Deltech and Stolt failed to notify MSC, Conti, and NSB that originating the shipment at New Orleans in June ran contrary to Deltech's safety protocols and risked DVB-80's stability by lengthening the summertime voyage. They also failed to arrange for the necessary temperature monitoring before loading. Stolt further breached its duty to warn by omitting heat warnings from the DGDs that it delivered to the carrier entities and failing to highlight or even note in the DGDs that the tanks had been filled early and sat outside at NOT. MSC could not be expected to know that the three tanks had been exposed to such conditions, and therefore presented a higher risk of danger, without an express warning from Deltech or Stolt. The tanks thus posed a "specific type and degree of danger" that was not adequately reflected in Stolt's and Deltech's warnings. *See DG Harmony*, 533 F.3d at 95; *see also Phase II*, 339 F. Supp. 3d at 195 (describing the conditions to which the DVB-80 was exposed as creating "ticking time bombs"). We therefore find no error in the district court's ruling that Stolt and Deltech breached their respective duties to the later participants in the shipment chain.

None of Stolt and Deltech's arguments to the contrary is persuasive. First, striving to fend off this conclusion, Stolt and Deltech contend that MSC's substantial prior experience with the chemical DVB-80 excused them from providing MSC with any further warning. MSC was adequately aware of the chemical's characteristics, they urge, to appreciate the risk presented by these tanks and their shipment in the summer months. We are not persuaded. It is true that a carrier's general knowledge of the nature of a cargo can be sufficient to defeat its claim for the shipper's strict liability, but a failure-to-warn claim turns on whether "it would have been reasonable to expect the carrier to know of *the specific type and degree of danger* posed by the cargo at issue." *DG Harmony*, 533 F.3d at 95. Conducting the "reasonable awareness inquiry"—in contrast to the "binary" strict liability assessment—"requires a fact-sensitive, 'calibrated' analysis

of the cargo's dangerousness and the extent to which that risk was different from risks commonly encountered by carriers." *Id.*

We are convinced that Stolt and Deltech bore a duty to warn other participants in the transportation chain of the particular characteristics of the tanks of DVB-80 that were left outside at New Orleans Terminal and later stowed aboard the Flaminia. We see no reasonable basis to expect the carrier, MSC (and through MSC, the other ship owning interests), to know of the specific degree of danger posed by the cargo as a result of its early loading and careless storage ashore. In *Senator Linie Gmbh*, we explained that "[i]n contrast to a carrier, which typically is in the position of taking aboard its vessel a large quantity and variety of cargoes, a shipper can be expected to have greater access to and familiarity with goods and their manufacturers before those goods are placed in maritime commerce." 291 F.3d at 169. The shipper, therefore, is often the party "in a better position to ascertain ahead of time the dangerous nature of shipped goods." *Id.*

Such is the case here. MSC had experience with DVB-80 and general information about DVB-80 was available in its databases, it is true. But to require MSC to "associate[e] the chemical properties it may know somewhere within its organization with a shipment of three discrete tanks," *Phase II*, 339 F. Supp. 3d at 238, would unreasonably allocate risk and burden among the parties—particularly when critical characteristics of those specific tanks were out of the ordinary. Stolt and Deltech, on the other hand, knew of not only the general dangerousness and heat sensitivity of DVB-80, but also the specific handling and stowage conditions that made the DVB-80 in the tanks aboard the Flaminia particularly hazardous.

Second, Stolt and Deltech resist the conclusion that they were negligent under Section 4(3) of COGSA by arguing that MSC failed in its "duty to listen" to those warnings that Deltech *did* provide. We decide that, even if MSC had such a duty, it

30

committed no breach: it "listened" to the information conveyed in the DGDs. Section

5.1.1.3.1 of the IMDG Code, which the parties here had an obligation to follow,[21]

requires a carrier to "receive[] a shipping paper" from the offeror of the dangerous good

that contains certain information about the cargo before carrying it. 49 C.F.R.

§ 176.24(a); *see also id.* § 172.200(a) (imposing on "each person who offers a hazardous

material for transportation" the requirement to properly "describe the hazardous

material on the shipping paper"). The district court reasonably found that in 2012, the

"shipping paper" that the cargo shipping industry used "as the central repository of

information relating to safe handling and transport of dangerous cargo" was the DGD.

*Phase II*, 339 F. Supp. 3d at 214. By regulation, a carrier is entitled generally to "rely on

information provided by the offeror of the hazardous material . . . unless the carrier

knows . . . that the information provided by the offeror . . . is incorrect." 49 C.F.R. §

171.2(f). Here, Stolt provided DGDs to MSC showing the UN number and class for

DVB-80—and nothing more. *Phase II*, 339 F. Supp. 3d at 214. The DGDs did not warn

MSC that DVB-80 could auto-polymerize when exposed to high temperatures, and they

did not inform MSC that these tanks of DVB-80 in particular had been exposed to

conditions that put the DVB-80 at a higher risk of auto-polymerization. The district

court determined based on the trial record that it was industry custom for a carrier to rely

on the shipper's DGDs to create a stowage plan. Stolt and Deltech have not shown that

this factual finding was clearly erroneous, and there is no basis for finding that MSC

---

[21] The U.S. Department of Transportation has promulgated regulations that incorporate the IMDG Code by reference. *See* 49 C.F.R. § 171.7. These regulations impose obligations on shippers and carriers of dangerous goods. *See id.* § 171.2(e) ("No person may *offer* or *accept* a hazardous material for transportation in commerce unless the hazardous material is properly classed, described, packaged, marked, labeled, and in condition for shipment as required by or authorized by applicable requirements of this subchapter[.]" (emphasis added)). SOLAS, which the United States has ratified, also requires compliance with the IMDG Code. *See Phase II*, 339 F. Supp. 3d at 198–99.

unreasonably relied on the DGDs here with respect to the tanks of DVB it stowed aboard the Flaminia.

Stolt and Deltech argue that MSC ignored—that it failed to "listen" to—the heat warning on the Master Bill of Lading Instructions. The district court concluded based on the evidence at trial that the MBLI was a "transport document," *i.e.*, not the type of document used "to convey necessary and critical safety information about a dangerous good," and therefore that Stolt and Deltech could not rely on it to escape liability. *Id.* at 238. We agree that the warning contained in the MBLI was insufficient to put MSC on notice of the specific type and degree of danger posed by DVB-80 once loaded onto the Flaminia. The MBLI's warning called for above-deck temperature monitoring because of heat sensitivity, certainly, but it did not disclose the temperature at which DVB-80 becomes unstable (27 degrees Celsius) or alert MSC to any of the natural consequences of overheating, including the auto-polymerization and explosion that happened here. Apart from those basic inadequacies, it also did not disclose that the tanks of DVB-80 had been filled early and had already been exposed to long days of heat. The general heat warning presented in the MBLI was insufficient to place MSC on reasonable notice of the dangerousness of the cargo that it agreed to carry for Stolt and Deltech. MSC did not breach any obligation to "listen" or by its actions relieve Stolt and Deltech of liability under a failure-to-warn theory.[22]

---

[22] We additionally find no merit in Stolt's argument that the district court's order should be reversed because it failed to make a legal determination as to causation, the second element of the failure-to-warn claim. To prevail on a failure-to-warn claim, a plaintiff must show that the "absent warning, if given, would have impacted stowage." *DG Harmony*, 533 F.3d at 94 (quoting *Contship Containerlines*, 442 F.3d at 78). Stolt argues on appeal that the district court "made no finding as to whether an adequate warning, if given, *would* have impacted MSC's stowage decision and averted the loss." Stolt Br. at 45. But the district court did, in fact, make factual findings to support the legal determination that had MSC properly been warned about the temperature risks, the need for temperature monitoring, and the DVB-80's early arrival at the

## III.     MSC's Lack of Negligence

The district court concluded that MSC was not negligent in its stowage and handling of the DVB-80. Deltech and Stolt challenge that conclusion. While the question is closer than the two we have just discussed, on *de novo* review, we are persuaded by the district court's analysis. We reiterate that while our review is *de novo*, we remain mindful of the "specific and complex facts" that form the basis of the district court's negligence determination, *In re City of New York*, 522 F.3d at 282, and therefore apply a "fact-sensitive, 'calibrated' analysis" on review, *DG Harmony*, 533 F.3d at 95.

MSC's rights and obligations as the carrier are governed by COGSA.[23] COGSA provides that "[t]he carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 30701 (note) § 3(2). Under the COGSA regime, a carrier is not liable for failing to store or stow cargo as suited for special conditions of which it was not aware. *See, e.g., DG Harmony*, 533 F.3d at 95 ("[T]he shipper had an obligation to inform the carrier of special requirements

---

terminal, MSC would not have loaded the DVB-80 onto the Flaminia. The court expressly held that "Stolt's failure to effectively inform MSC *resulted in* the DVB cargo being stowed aboard the Flaminia, and the crew being blind to that fact." *Phase II*, 339 F. Supp. 3d at 239 (emphasis added). The court also found that "[h]ad the temperature been checked on June 30 or July 1 when the product was loaded, [it] is persuaded that the DVB cargo would have been pulled from the Flaminia." *Id.* at 237. We are convinced that these findings by the district court adequately establish causation.

[23] "By its terms, COGSA governs bills of lading for the carriage of goods 'from the time when the goods are loaded on to the time when they are discharged from the ship.'" *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 29 (2004) (quoting COGSA § 1(e)); *see also Herod's Stone Design v. Mediterranean Shipping Co., S.A.*, 846 F. App'x 37, 39 (2d Cir. 2021) (summary order) (same). COGSA also gives shippers and carriers the option to extend by contract COGSA's coverage to include periods of handling on land. *See Kirby*, 543 U.S. at 29 (citing COGSA § 7). Deltech, Stolt, and MSC have done so here. Clause 6.1 of the Sea Waybills makes COGSA the applicable legal regime as a matter of contract "throughout the entire time the [DVB-80 tanks] are in [MSC's] custody, including before loading and after discharge." Exs. at 3635, 3640; *see also Phase II*, 339 F. Supp. 3d at 240 n.97.

regarding stowage location, and to make such special arrangements in advance of stowage[.]"); *O'Connell Mach. Co. v. M.V. Americana*, 797 F.2d 1130, 1134 (2d Cir. 1986) (same); *Tenneco Resins, Inc. v. Davy Int'l AG*, 881 F.2d 211, 213–14 (5th Cir. 1989) (holding that a carrier was not required to protect cargo from rain absent special instructions).

The district court correctly determined that MSC did not breach its duty of care in its stowage or general handling of the DVB-80 tanks because MSC's handling of the cargo was proper assuming "normal voyage conditions" and because Stolt and MSC never provided any special instruction or warning regarding the heightened dangerousness of this cargo. *Phase II*, 339 F. Supp. 3d at 235. Stolt gave MSC three sets of documents regarding the July 1 shipment: on June 20, the preliminary DGDs; on June 25, the MBLI; and on June 26, the final DGDs. Of these three, only the MBLI contained any heat warning at all.

The district court concluded that, consistent with industry practice, the DGDs—not the MBLI or any combination of documents—were the "central repository of information relating to the safe handling and transport" of the ship's cargo, and that it was reasonable for MSC to rely on the DGDs for accurate information regarding the type of hazard posed by the DVB-80.[24] *Phase II*, 339 F. Supp. 3d at 214. It further found that "MSC's practice, and industry practice, was to use DGDs as the primary source of safe handling information for dangerous goods." *Id.* The only special instructions provided—to stow the DVB-80 "above deck for temperature monitoring"—were in the MBLI, which MSC did not receive until June 25, far too late for MSC to use in creating

---

[24] While "COGSA does not require a shipper to use any particular method . . . to inform a carrier of the dangerous properties of its cargo" in order to defeat a strict liability claim, *Chem One, Ltd. v. M/V RICKMERS GENOA*, 502 F. App'x 66, 71 (2d Cir. 2012) (summary order), a district court may properly consider the method used to convey safety information when determining whether a shipper or carrier acted negligently in carrying out its respective duties, *see id.* at 73.

its stowage plan. Additionally, the district court found that the MBLI "is neither designed nor used in the industry to provide a vessel with special handling instructions for dangerous goods." *Id.* at 213. While an alleged tortfeasor cannot "rely *solely* upon its adherence to industry standards, customs, or practices as a *per se* defense to a negligence claim," *Berretta v. Tug Vivian Roehrig, LLC*, 259 F. App'x 343, 344–45 (2d Cir. 2007) (summary order), a court may properly consider custom or standard practice in the industry as a "useful measure in assessing the standard of care," *In re City of New York*, 522 F.3d at 285 (citation omitted). Indeed, "[c]ourts will not lightly presume an entire industry negligent." *Id.* (citing *Spancrete Ne. Inc. v. Occupational Safety & Health Rev. Comm'n*, 905 F.2d 589, 594 (2d Cir. 1990)). Here, the district court's factual findings regarding MSC's practice and industry custom were well supported by the record and not clearly erroneous.

In any case, even if MSC should have relied on the MBLI, MSC did not receive it until after the DVB-80 was loaded into tanks and after the tanks had already sat stagnant in the sun at New Orleans Terminal for four days, at which point it was far too late to alter existing stowage plans. At trial, MSC offered testimony that providing instructions for stowage on June 25 through the MBLI was too close to the July 1 loading date for MSC to make alternative loading arrangements. *See Phase II*, 339 F. Supp. 3d at 213 (finding that special handling instructions must be received "further in advance of the cargo so that proper arrangements can be made"). This circumstance made the temperature monitoring instruction on the MBLI functionally useless absent concurrent instructions forbidding shipment when the carrier could not adhere to the instructions. Apart from the general heat warning on the MBLI—which did not reveal the temperature at which DVB-80 became unstable or advise that the chemical could auto-polymerize above such a temperature—Stolt never requested, either at the time of booking or at any point thereafter, special stowage, segregation, or handling of the DVB

cargo. *Id.* And of course, the MBLI did not inform MSC that the tanks had been filled early, had sat in the sun at the Terminal, or that these conditions increased the risk that the DVB-80 inside the tanks would auto-polymerize and cause an explosion.

Based on these factual findings, we decide that a carrier in 2012 could exercise reasonable care by relying on the information it received from a shipper at the time of booking and that it was provided by the cargo's DGDs to plan safe stowage. As the district court observed, "[i]t would have been impractical for carriers to have had multiple pieces of paper relating to handling dangerous goods, the primary use of which was different . . . and then to have had to compare them to each other and/or to a DGD." *Phase II*, 339 F. Supp. 3d at 214. We therefore find no error in the district court's determination that MSC met its standard of care with respect to its stowage of the DVB-80 cargo aboard the Flaminia. Stolt had the requisite knowledge and authority but made no arrangements for special stowage and gave MSC no precise temperature instructions, either at the time of booking or in the DGDs. Employees from both Stolt and Deltech testified that to provide such special instructions would be standard practice for certain cargos. *See, e.g.*, Joint App'x at 8231–32 (testimony of Deltech employee); *id.* at 4556–60 (testimony of Stolt employee); *see also id.* at 3108 ("MSC . . . expect[s] that any special requests will be made by the customer before or at the time of booking . . . ."). In this setting, it was reasonable for MSC to stow the DVB-80 tanks below deck in Hold 4, next to Chemtura's heated DPA tanks and near the ship's heated bunker tanks.[25]

---

[25] We agree with the district court that MSC's stowage of the DVB-80 tanks next to the heated DPA containers and near the ship's fuel tanks did not breach its duty to properly stow the cargo under COGSA. Even assuming that the MBLI's vague heat warning was sufficient to put MSC on notice of this particular cargo's heat sensitivity, MSC's handling of the tanks was adequate. The district court found that MSC's policy called for stowing *all* dangerous goods as if they

The evidence presented at trial also supports the conclusion that neither Stolt nor Deltech expected the DVB-80 to be stored above-deck or that MSC (or the ship's crew) would monitor the chemical's temperature during the voyage. *See Phase II*, 339 F. Supp. 3d at 208 n.36 (finding that "Stolt did not charge Deltech extra" for obtaining temperature monitoring and did not request temperature monitoring when booking the cargo with MSC); *id.* at 211 n.40 (concluding that "above deck stowage was not a Deltech requirement" based on testimony from Deltech's president, Robert Elefante, that "whether the [DVB-80] was stored above or below deck ultimately did not matter so long as the ISO containers were kept away from a heat source"); *id.* at 223 n.76 (finding that above-deck stowage was not included in Deltech's operative shipping protocols at the time of the incident and noting the testimony of Zachary Levine, Deltech's VP of Commercial Operations, that "storage of the DVB ISO containers *below deck* was acceptable to Deltech" (emphasis added)). In other words, the DVB-80's stowage below deck in Hold 4 was entirely foreseeable to Stolt and Deltech.

Stolt and Deltech's expectation that the DVB might be stowed either below or above deck was consistent with the IMDG Code, as well.[26] Deltech and Stolt properly identified DVB-80 as an "Environmentally Hazardous Substance[], Liquid, NOS [Not

---

were heat sensitive, which meant stowing this cargo away from bunker tanks and motors. Hold 4, while adjacent to the ship's wing tanks containing heated fuel oil, had been approved for dangerous goods by the vessel's classification society. With respect to stowage next to the heated DPA containers, Chemtura never informed MSC that its containers could radiate heat and MSC had no reason to know of this fact. Indeed, DPA, like DVB-80, was Class 9 cargo and the IMDG Code does not have any separation requirements for cargo within this class. Additionally, the IMDG Code does not treat cargo itself as a heat source. *See* Joint App'x at 3337 (quoting IMDG Code § 7.1.1.15). While the district court found that the DPA containers and the ship's fuel tanks increased the temperature in Hold 4, *see Phase I*, 2018 WL 526549, at *26, this fact is insufficient to find that MSC breached its duty of care in the stowage of the DVB-80 tanks, which it reasonably assumed were safe for transport under normal conditions.

[26] As discussed, *supra* n.21, carriage of dangerous goods must conform to the IMDG Code's requirements for stowage.

Otherwise Specified] UN 3082, Class 9." *Phase II*, 339 F. Supp. 3d at 214. Cargo with this classification is considered to be vessel stowage category A. *See* Joint App'x at 3335. "Stowage category A means the material may be stowed 'on deck' or 'under deck' on a cargo vessel or on a passenger vessel." 49 C.F.R. § 172.101(k)(1). The IMDG Code does not require that UN 3082 cargo, if placed below deck, be stowed in a ventilated area. We therefore identify no error in the district court's finding that MSC treated the tanks exactly as specified by the IMDG Code.

Absent a booking request for on-deck stowage and temperature monitoring, MSC's stowage of the three DVB-80 tanks below deck in Hold 4 was both reasonable and foreseeable to Stolt and Deltech. Therefore, the district court's determination that MSC did not breach its duty of care by stowing the DVB-80 below deck does not "manifest[] an incorrect conception of the applicable law." *In re City of New York*, 522 F.3d at 282 (quoting *Esso Standard Oil S.A. v. S.S. Gasbras Sul*, 387 F.2d 573, 580 (2d Cir. 1967)).[27]

---

[27] The district court also held that the COGSA fire exception protected MSC. That exception protects the carrier from responsibility for damage caused by fire, unless the fire is the "actual fault" of the carrier. COGSA § 4(2)(b). As a general matter, a shipper can recover against a carrier "merely by showing that the carrier received the [shipper's] goods in sound condition and delivered them damaged." *Asbestos Corp. Ltd. v. Compagnie De Navigation Fraissinet et Cyprien Fabre*, 480 F.2d 669, 672 (2d Cir. 1973). The carrier thus normally bears the burden of proof to show that it exercised due diligence. *Id.* COGSA's fire exception shifts the burden of proof to the shipper, requiring it to "prove that the carrier's negligence caused the fire or prevented its extinguishment." *In re Ta Chi Nav. Corp., S.A.*, 677 F.2d 225, 229 (2d Cir. 1982); *see also Asbestos Corp.*, 480 F.2d at 672–73. Because Stolt and Deltech have not proved that MSC stowed the DVB-80 negligently, the district court correctly concluded that the explosion aboard the Flaminia was not the "actual fault" of MSC. *Ta Chi*, 677 F.2d at 229. The facts here are unlike those at issue in *In re Liberty Shipping Corp., Motor Ship Don Jose Figueras*, 509 F.2d 1249, 1252 (9th Cir. 1975), where the Ninth Circuit held that the fire was the "actual fault" of the carrier because the carrier "permitt[ed] the vessel to put to sea without having properly trained the master and crew in the use of fire-fighting equipment." *Id.* In that case, there was evidence of "owner

IV.    **Conti and NSB's Lack of Negligence**

The district court concluded that NSB and Conti were not negligent in hiring or training the crew on the Flaminia and that the crew acted reasonably when confronted with the vapor generated under-deck by Deltech's DVB-80. Stolt and Deltech challenge this conclusion, arguing that the crew should have known that the vapor was not smoke caused by a fire and that moving the manhole covers could generate a potentially catastrophic spark. On review, we agree with the district court.

When the district court's findings of fact are "premised upon credibility determinations, we grant particularly strong deference to those findings." *United States v. Mendez*, 315 F.3d 132, 135 (2d Cir. 2002); *see also Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.*, 422 F.3d 72, 76 (2d Cir. 2005) (deferring to district court's factual findings, "particularly those involving credibility determinations"). Here, the district court's concluded that Conti and NSB were not negligent in their firefighting conduct because they responded appropriately based on their belief that a fire had broken out in Hold 4. This determination rested largely on the testimony of Captain Brian Hall, an expert in shipboard firefighting, with over 20 years of relevant experience. *See Phase II*, 339 F. Supp. 3d at 226 n.83. The district court found Captain Hall's testimony persuasive, calling the Captain "knowledgeable, consistent, and logical"; it "relie[d] heavily on his opinions." *Id*. We accordingly afford strong deference to those of the district court's findings that were premised on Captain Hall's testimony.

Captain Hall testified that the captain, officers, and crew aboard the Flaminia were "appropriately trained and drilled in firefighting procedures and equipment, and were in compliance with applicable regulations." *Id*. at 227. He gave his view that it was

---

neglect and actual fault constituting failure to exercise the due diligence required by COGSA." *Id*. Not so here.

reasonable for the crew to believe that opening the man-lid when confronted with an already-oxygenated fire would not have caused an explosion. Relying on this testimony, the district court found that, under the circumstances as the crew reasonably perceived, opening the man-lid would not initiate oxygenation because, "the presence of the smoky cloud indicated that any fire was already oxygenated." *Id.* at 235. Thus, "there was reason to assume that opening a man[-]lid and placing a hose into the Hold could assist in addressing what was believed to be a fire," according to the district court. *Id.* We identify no error in the district court's finding on the basis of Captain Hall's testimony that the crew aboard the Flaminia was not negligent in opening the man-lid. We reject Stolt and Deltech's contentions to the contrary.

The district court also determined that Conti and NSB did not act negligently by failing to release more carbon dioxide ("$CO_2$") into Hold 4. The district court found that, "while the [carbon dioxide] system was not perfectly designed or installed, it worked appropriately." *Id.* at 228. It also concluded that it was not unreasonable for the crew to believe that they were dealing with a fire, rather than a DVB-80 vapor cloud.[28] Neither Stolt nor Deltech have demonstrated persuasively that these conclusions are erroneous. We therefore affirm the district court's determination that the crew's conduct did not make Conti and NSB liable for the loss.

---

[28] Separately, the district court concluded that NSB and Conti, like MSC, are entitled to the protections of the "fire exemptions" in COGSA and the Limitation of Shipowner's Liability Act (the "Limitation Act"). Because the fire did not result from the "actual fault" or negligence of MSC, NSB, or Conti, the district court was correct that these defenses are available to these three parties. *See* 46 U.S.C. § 30701 (note) §§ 4(2)(b),(q) (COGSA "fire exemptions"); 46 U.S.C. § 30522 (Limitation Act "loss by fire" provision, earlier codified at 46 U.S.C. § 30504). *See* n.27, *supra.*

## V.    New Orleans Terminal's Lack of Negligence

The district court concluded that the Terminal was not negligent under federal maritime law because its actions—permitting stowage of the DVB-80 tanks in the open air in the terminal yard—was "consistent with its own prior practice as well as industry practice." *Id.* at 195. We find no error in this determination and the parties identify none persuasively.

The district court found that "[n]one of [New Orleans Terminal's] processes or procedures are confidential" and its storage handling is conducted "literally out in the open—if a shipper is sending cargo out of New Orleans, he can expect that at some point it will arrive at [New Orleans Terminal's] yard; if the shipper has not made other arrangements, it is entirely foreseeable that the cargo will sit in that yard, stagnant, under the New Orleans sun." *Id.* at 221. Deltech and Stolt did not instruct or even imply in the booking with New Orleans Terminal that the cargo should be stored in any other manner. *Id*. Further, they failed to ensure that the external temperature gauge on each tank of DVB-80 was checked prior to its loading onto the Flaminia. *Id.*

Stolt and Deltech insist nonetheless that the Terminal was negligent in its handling and storage of the DVB-80. They argue primarily that New Orleans Terminal fell below the applicable standard of care when it failed to heed the warnings that appeared on the Straight Bills of Lading and Materials Safety Data Sheet, to the effect that the DVB-80 cargo was heat sensitive and should not be stored in direct sunlight.

The evidence showed that New Orleans Terminal's longstanding practice is to recognize only those handling and storage instructions that it receives at the time of booking from the carrier (here, MSC), and not the delivery agent (here, Boasso). For this reason, New Orleans Terminal neither noted nor followed the warnings contained in the Straight Bills of Lading and Material Safety Data Sheet, which were delivered to it

by Boasso. Rather, those documents were "filed away," *id.* at 220, and used just to identify the source of the shipment and the UN cargo type.

It was established at trial that New Orleans Terminal provides information to the general public about how it processes cargo. It was incumbent on Stolt and Deltech, arranging for the dangerous shipment—especially when the shipment was contrary to Deltech's protocols insofar as it was slated for a summer loading in New Orleans rather than Newark—to inform themselves about how the Terminal operated and align the safety measures they took accordingly. They, not the Terminal, were in the best position to identify the risks and take steps to secure appropriate storage at the Terminal. Absent such measures, it was entirely foreseeable to both Deltech and Stolt that the tanks would sit "in the open sun at [New Orleans Terminal], adjacent to other UN number 3082, Class 9 cargo." *Id*. at 221. Having failed to inform themselves of NOT's procedures and to take direct measures for special handling of the DVB-80 cargo, Stolt and Deltech cannot transform New Orleans Terminal's handling of the cargo in accordance with its published practices into the Terminal's negligence merely by delivering otherwise ordinary transit documents. Accordingly, we find no error in the district court's determination that the Terminal was not negligent.

## VI.    No Recovery Against BDP

In addition to the tort claims discussed above, Stolt sued its subcontractor BDP for breach of contract to obtain indemnification and/or contribution for Stolt's damage liability. Below, Stolt argued that BDP's handling of the shipment documentation was a cause of the accident and, at the very least, deprived Stolt of a defense to the tort and contract claims brought by the other parties to this action. On appeal, Stolt presses only the second theory.

It was BDP's role to process documents related to the shipment for Stolt: the district court referred to BDP as Stolt's "Documentation Department." *Phase II*, 339 F. Supp. 3d at 195. It is undisputed that BDP failed to obtain from MSC a Sea Waybill that included the correct stowage instructions and that, in this way, BDP breached its contractual obligations to Stolt. The district court nevertheless determined that BDP's breach is not actionable because it was not this breach that caused harm resulting in Stolt's liability, nor did this breach deprive Stolt of any real defense. We are persuaded that this conclusion is correct.

When BDP transmitted the draft of Stolt's multipage Sea Waybill to MSC in the form of the MBLI, it included the following instruction: "DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING." *Id.* at 204 n.25. But when MSC prepared a proof copy of the Sea Waybill based on the MBLI and sent it back to BDP, the document omitted the heat warning. BDP failed to notice this omission. As a result, the final Sea Waybills between Deltech, Stolt, and MSC did not include the MBLI's instruction regarding DVB-80's heat sensitivity or the direction to store the cargo above deck. *Id.* at 217. On the face of it, this could have been a crucial omission. The instruction, while somewhat vague, was the only explicit warning of DVB-80's heat sensitivity received by MSC.

The evidence at trial indicated, however, that none of the parties—including MSC, Stolt, and Deltech—would have considered this stowage instruction to be operative, and that MSC would not (and arguably could not) have acted on it even if it had been included in the Sea Waybills. *See id*. at 243 ("[There] is insufficient evidence that had that language been preserved, MSC here would have acted differently or had different legal responsibilities to do so."). The evidence presented at trial demonstrated that MSC's Sea Waybills did not "play any operational function in the stowage plan" for the Flaminia, as that task had "been completed by the time these documents [were]

issue[d]," *Phase II*, 339 F. Supp. 3d at 223, but were used only as contract of carriage (i.e., maritime contracts that formalized the relationships among the parties), *see id.* at 241. Instead, special requests for stowage were expected to be communicated to MSC prior to or at the time of booking. Joint App'x at 3108. Deltech's booking requests to Stolt called for stowage *either* "in stack" *or* "below deck," since either would "avoid exposure to direct sunlight." *Phase II*, 339 F. Supp. 3d at 202 n.17. MSC followed this instruction by storing the DVB-80 in Hold 4.[29]

On appeal, Stolt maintains that had BDP ensured that MSC had included the instructions on the Sea Waybills, Stolt could at least have raised MSC's breach as a defense to its own breach and thereby averted or diminished its own liability. Stolt asserts that in a scenario in which BDP had ensured that the Sea Waybills included this explicit language directing temperature monitoring and stowage above decks, "Stolt would not have been liable to MSC and NSB/Conti under the Master contracts, and Stolt would have had valid contractual bases to assert claims against MSC." Stolt Reply Br. 56.

This argument has some force. Even were we to assume that Stolt could have asserted a breach of contract action against MSC for failing to adhere to the Sea Waybills, however, Stolt does not explain how MSC's subsequent hypothetical breach would have excused, prevented, or superseded its own. In other words, Stolt does not explain how the inclusion of the heat warning on the Sea Waybills would have adequately warned MSC of the specific degree of danger posed by the DVB-80 cargo

---

[29] The evidence presented at trial was consistent with the district court's earlier determination that BDP was entitled to summary judgment on Stolt's claim that BDP's breach was a proximate cause of the loss aboard the Flaminia. *See In re M/V MSC Flaminia*, No. 12-cv-8892, 2017 WL 3738726, at *6 (S.D.N.Y. Aug. 30, 2017). Even though BDP's omission of the heat warning amounts to a breach of contract, the district court concluded that its relationship to the explosion was too attenuated to be considered a proximate cause of the loss.

aboard the Flaminia such that it could have defended against the carrier interests'
failure-to-warn claim.

Stolt bore an affirmative obligation, independent of the documentation
responsibilities it delegated to BDP, to warn MSC of the dangerousness of the DVB-80—
an obligation placed squarely on Stolt by both COGSA and the Sea Waybills. The
district court ruled that Stolt breached Clause 15.1[30] of the Sea Waybills by failing to
warn MSC of three important and interrelated facts: (1) the three tanks were loaded
with DVB-80 early at the Deltech plant; (2) it delivered tanks filled with DVB-80 that
would auto-polymerize in hot conditions; and (3) it deposited those tanks outside in the
terminal yard in New Orleans to sit stagnant and heat up for the many days until vessel
departure. *Phase II*, 339 F. Supp. 3d at 246. The heat warning that was omitted from the
Sea Waybills—the same warning that MSC *did* receive on the MBLI—would not have
adequately warned MSC of any of these three conditions.

The district court also decided that Stolt breached its obligation under Clause
15.1 to "fully inform" MSC by failing in the DGDs to warn of the risk that DVB-80
would auto-polymerize under certain conditions. *Id.* at 247. This was crucial, the court
found, because it was the DGDs on which carriers in general and MSC in particular
rely, rather than the Material Safety Data Sheet or MBLI. *Id.* Acting on behalf of Deltech,
Stolt therefore breached its fundamental duty to warn when at booking it failed to
request special handling and sent MSC DGDs in which no heat warning was provided.
Even a heat warning in the Sea Waybills, then, would not have excused Stolt's separate

---

[30] Clause 15.1 provides that when the "merchant" (Stolt and Deltech) "delivers Goods of a
dangerous or hazardous nature to the Carrier" (MSC), Stolt and Deltech "shall fully inform
[MSC] in writing of the precise and accurate details of the Goods, and special precautions or
handling required for the Goods." *Phase II*, 339 F. Supp. 3d at 245. The operative Sea Waybills
identify MSC as the carrier, Stolt "on behalf of" Deltech as the shipper, and Stolt as the
consignee. *Id.* at 241.

material breach in the deficient DGDs.[31] Stolt's failure to explain this deficiency only heightens our conviction that any failure by MSC that Stolt may now hypothesize—a speculative failure to heed the Sea Waybill's hypothetical instructions to stow the DVB-80 above deck and to monitor temperature—would not excuse Stolt's more profound breach. Therefore, BDP's failure to include the instructions on the Sea Waybill did not deprive Stolt of any real defense and warrants no practical effect in the allocation of liability between those two parties.

## VII. MSC, Conti, and NSB's Entitlement to Indemnification by Stolt and Deltech

The district court held that the terms of the Sea Waybills require Stolt and Deltech to indemnify MSC, as well as its subcontractors Conti, and NSB, for their losses. Under Clause 15.2 of the Sea Waybills, the "Merchant" (here, Stolt and Deltech) agrees to indemnify the "carrier" (MSC) and its "subcontractors" (Conti and NSB) for "all loss, damage, delay, personal injury, death or expenses . . . arising from such [dangerous or hazardous] Goods and/or from the breach of clause 15.1." *Phase II*, 339 F. Supp. 3d at 245–46 (quoting Sea Waybills Cl. 15.2) Because we agree with the district court's rulings that Stolt and Deltech breached Clause 15.1 and that MSC, Conti, and NSB were not negligent, we find no error in the district court's further holding that MSC and its

---

[31] Stolt arranged the booking with MSC on June 11, the date when (according to the district court) it would have been appropriate for Stolt to request special stowage. On June 20, Stolt sent the draft DGDs to MSC. MSC did not develop its stowage plan for the Flaminia until June 28. *See Phase II*, 339 F. Supp. 3d at 202–04. Therefore, MSC's hypothetical breach (developing a stowage plan that ignored the Sea Waybill) would not provide Stolt with a valid excuse for its failure to perform adequately under the contract, nor would it have provided Stolt with a valid contractual claim against MSC, since Stolt's own breach occurred prior to MSC's hypothetical one. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (requiring adequate performance of the contract by the claimant for a successful breach of contract claim).

subcontractors are entitled to be indemnified by Stolt and Deltech: the loss or damage to MSC, Conti, and NSB indisputably arose at least in part from that breach.

As discussed above, we determine that the district court did not err in concluding that Stolt and Deltech violated Clause 15.1 of the Sea Waybills.[32] Clause 15.1 required them each to "fully inform [MSC] in writing of the precise and accurate details of the [DVB-80], and the special precautions or handling required for the [DVB-80]." *Id.* at 245. Deltech and Stolt failed to inform MSC that the temperature of the DVB-80 should be checked and monitored before loading onboard and that the chemical should not be loaded if its temperature exceeded 27 degrees Celsius. Deltech and Stolt also did not fully inform MSC of the hazardous or potentially dangerous characteristics of this particular shipment of DVB-80—the now-familiar, troubling facts that the tanks were filled early, sat stagnant in steamy New Orleans for ten days, and thus were significantly more susceptible to auto-polymerization during the voyage. *Id.* at 246–47.

Because Stolt and Deltech breached Clause 15.1, we agree with the district court that they must indemnify MSC and its subcontractors, Conti and NSB, pursuant to Clause 15.2 of the Sea Waybills.[33]

---

[32] Based on the information in the MBLI, MSC prepared the three Sea Waybills—one for each tank—and provided them to BDP. The Sea Waybills, alongside a 2011 service contract between Stolt and MSC (the terms of which are not at issue here) governed the contractual relationship between Deltech, Stolt, and MSC. *See Phase II*, 339 F. Supp. 3d at 209.

[33] Because we also agree with the district court that MSC, Conti, and NSB were not negligent, *see* above Parts III–IV, we do not reach the question addressed by our dissenting colleague with regard to the enforceability of Clause 15.2 of the Sea Waybills in light of the Harter Act, 46 U.S.C. § 30701, *et seq. See* Diss. Op. at 6–9.

## CONCLUSION

We have considered the parties' remaining arguments and find in them no basis for any additional reversal. Accordingly, the district court's order is **REVERSED** in part, to the extent that the district court determined that Deltech and Stolt were strictly liable under Section 4(6) of the Carriage of Goods at Sea Act. The district court's order is otherwise **AFFIRMED** in part, insofar as it ruled as follows:

(1) Stolt and Deltech were liable under a failure-to-warn theory.

(2) MSC was not negligent in its stowage and handling of the DVB-80 shipment.

(3) NSB and Conti were not negligent in hiring or training the crew on the Flaminia, and the crew acted reasonably.

(4) New Orleans Terminal was not negligent in its handling of the shipment.

(5) BDP's breach is not actionable by Stolt because the breach did not proximately cause the resulting harm and did not deprive Stolt of a defense.

(6) The Sea Waybills require Stolt and Deltech to indemnify MSC, Conti, and NSB for their losses.

The case is **REMANDED** for further proceedings consistent with this Opinion.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

Date: June 30, 2023
Docket #: 18-2974cv
Short Title: In Re: M/V MSC FLAMINIA

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 12-cv-8892
DC Court: SDNY (NEW YORK CITY)
DC Judge: Pitman
DC Judge: Sullivan

## BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
*  be filed within 14 days after the entry of judgment;
*  be verified;
*  be served on all adversaries;
*  not include charges for postage, delivery, service, overtime and the filers edits;
*  identify the number of copies which comprise the printer's unit;
*  include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
*  state only the number of necessary copies inserted in enclosed form;
*  state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
*  be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

Date: June 30, 2023
Docket #: 18-2974cv
Short Title: In Re: M/V MSC FLAMINIA

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 12-cv-8892
DC Court: SDNY (NEW YORK CITY)
DC Judge: Pitman
DC Judge: Sullivan

**VERIFIED ITEMIZED BILL OF COSTS**

Counsel for
_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the
_____

and in favor of
_____

for insertion in the mandate.

Docketing Fee        _____

Costs of printing appendix (necessary copies _____ ) _____

Costs of printing brief (necessary copies _____ _____) _____

Costs of printing reply brief (necessary copies _____ ) _____

**(VERIFICATION HERE)**

_____
Signature

18-2974(L)
*In re: M/V MSC Flaminia*

MENASHI, *Circuit Judge*, concurring in part and dissenting in part:

I join Parts I, II, IV, and V of the court's opinion. For the reasons the court states, the district court erred when it decided that Deltech and Stolt could be held strictly liable under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 note.[1] But the district court did not err when it held that Deltech and Stolt were negligent under COGSA on a failure-to-warn theory or when it held that Conti, NSB, and NOT were not negligent for those entities' respective actions.

I disagree with the court about three issues. First, the district court erred in holding that MSC was not negligent. Second, the district court erred when it concluded that Stolt's breach-of-contract claim against BDP is not actionable because BDP did not cause any harm to Stolt. Third, MSC is not entitled to full indemnification from Deltech and Stolt.

## I

The district court concluded that MSC was not negligent at all. That was erroneous. Even if Deltech and Stolt had duties to provide additional warnings and failed to discharge those duties, MSC received information concerning the stowage of DVB-80 but failed to heed those warnings. The instructions for the Master Bill of Lading ("MBLI") explained that the DVB-80 was to be stowed away from heat sources. *In re M/V MSC Flaminia*, 339 F. Supp. 3d 185, 204 n.25 (S.D.N.Y. 2018) ("The Master Bill of Lading Instructions provided the following heat warning: 'DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING.'") There is no doubt that

---

[1] Unless otherwise noted, I use the same abbreviations as the opinion of the court.

MSC received those instructions; it relied on the instructions to generate the Sea Waybills. Had MSC complied with the instructions, the DVB-80 might not have autopolymerized and exploded. That is because, in addition to the early filling of the tanks and the tanks' stowage at the NOT dock, the district court identified two factors that "substantially contributed" to the autopolymerization: "[t]he placement of [the tanks] in Hold 4, where it was stored next to the containers of heated DPA and near the ship's heated fuel tanks" and the "hotter-than-typical ambient temperatures in Hold 4." *Id.* at 192 (quoting *In re M/V MSC Flaminia*, No. 12-CV-8892, 2018 WL 526549, at *30-31 (S.D.N.Y. Jan. 23, 2018)). The DVB-80 would not have been exposed to those conditions had MSC heeded the warnings provided in the MBLI.

In concluding that MSC's failure to heed the warnings contained in the MBLI was not negligent, the district court focused almost entirely on the method by which Stolt communicated information about the proper stowage of DVB-80. The district court identified "the DGD as the locus of critical information and warnings about the dangers of goods" and concluded that "Stolt's DGDs were defective." *Id.* at 238. It is correct that the DGDs were defective, but the district court's emphasis on those documents was misplaced. "COGSA does not require a shipper to use any particular method … to inform a carrier of the dangerous properties of its cargo." *Chem One, Ltd. v. M/V Rickmers Genoa*, 502 F. App'x 66, 71 (2d Cir. 2012). The district court even acknowledged that "other shippers and NVOCCs had included handling instructions on bills of lading or other non-DGD documents," *Flaminia*, 339 F. Supp. 3d at 219, indicating that maritime custom does not make it reasonable to rely solely on the DGDs. *See The Innocenta*, 13 F. Cas. 64, 65 (S.D.N.Y. 1879) ("[T]o make a custom of the port, the rule must be so generally known and

acknowledged and acted upon, as virtually to be applied by the whole of that part of the business community which it would affect."). Because neither COGSA nor maritime custom permits a carrier to ignore information other than that contained in the DGDs, MSC was not entitled to disregard the warning because it was not presented on a particular form. I would reverse the district court's decision that MSC was not negligent.

The court responds that, "even if MSC should have relied on the MBLI, MSC did not receive it until after the DVB-80 was loaded into tanks and after the tanks had already sat stagnant in the sun at New Orleans Terminal for four days, at which point it was far too late to alter existing stowage plans." *Ante* at 35. The court concludes that the MBLI's warnings were "functionally useless absent concurrent instructions forbidding shipment when the carrier could not adhere to the instructions." *Id.* But MSC received the MBLI on June 25—days before "MSC develop[ed] its stowage plan for the cargo aboard the Flaminia" on June 28 and well before the Flaminia even arrived at NOT to receive the cargo on June 30. *Flaminia*, 339 F. Supp. 3d at 204. The loading was not complete until July 1. *Id.*

In another part of its opinion, the court holds that Stolt failed to provide MSC with "material information about the DVB-80 tanks," specifically that "the tanks of DVB-80 onboard the Flaminia had been delivered early to New Orleans Terminal and sat there day after day, exposed to the sun." *Ante* at 28. If that holding is correct—and I believe it is—then it means that MSC could have acted to prevent risks even after the DVB-80 was loaded into tanks and sat out in the sun. MSC could have, for example, monitored the temperature of the DVB-80 or stowed it away from heat sources—as the MBLI directed.

Even if MSC could not have changed its stowage plan in response to the MBLI—despite the fact that the stowage plan had not yet been developed—MSC could have contacted Stolt or Deltech to determine the risks of failing to follow the heat warning. Because MSC did not do anything to heed the heat warning it received from the shipper, I would hold that it was negligent.

On remand, the district court would need to determine whether and to what extent MSC's breach of its duty of care gives rise to liability. Assuming the resultant damage flowed directly from MSC's breach and was within the scope of the risk of MSC's negligent act, *see In re Kinsman Transit Co.*, 338 F.2d 708, 724 (2d Cir. 1964) (Friendly, J.) ("The weight of authority in this country rejects the limitation of damages to consequences foreseeable at the time of the negligent conduct when the consequences are 'direct,' and the damages, although other and greater than expectable, is of the same general sort that was risked."), the district court would need to apportion fault between Deltech, Stolt, and MSC in the first instance. *See Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980) (noting that "[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve" except "where only one conclusion may be drawn from the established facts"). I would remand for the district court to make that determination.

## II

The district court erred when it concluded that Stolt's breach-of-contract claim against BDP was not actionable because the breach did not cause harm. BDP's breach did in fact harm Stolt because, had the Sea Waybills contained terms requiring the stowage of DVB-80

4

away from heat sources, MSC's conduct in this case—its stowing of the DVB-80 near heat and its lack of temperature monitoring—would have constituted a contractual breach of the Sea Waybills. MSC's contractual breach would render it liable to Stolt for its lack of proper stowage, and the other terms of the Sea Waybills—including the indemnity provision—could not be invoked against Stolt and Deltech after MSC's breach. *See U.W. Marx, Inc. v. Koko Contracting, Inc.*, 124 A.D.3d 1121, 1122 (N.Y. App. Div. 3d Dep't 2015) (explaining that one party's "prior material breach" relieves the other party of its duty to "perform[] its remaining obligations under the contract").

BDP argues that MSC would never have agreed to include such a provision in the Sea Waybills. That argument fails for several reasons. First, there is evidence that MSC had previously permitted stowage instructions to be included in sea waybills. In early June 2012 Deltech shipped a container of DVB-80 on the MSC Marianna. The sea waybill issued for that shipment contained the exact warning at issue in this case: "DO NOT STOW NEAR HEAT SOURCES. STOW ABOVE DECK FOR TEMPERATURE MONITORING." Exs. 5346-47. The same warning appeared on a sea waybill issued by MSC to Deltech in February 2012 for a shipment of DVB-63. *See* Ex. 5351. Second, the relevant comparator for causation-of-damages purposes is the state of affairs in which BDP *had* performed its duties; it was BDP's obligation to *secure* Sea Waybills with the appropriate stowage instructions, and doing so would have altered MSC's legal obligations. Third, even if BDP's obligation was solely to seek—rather than to *secure*—the inclusion of Deltech's stowage instructions in the Sea Waybills, the proper and adequate performance of BDP's duties required it to inform Stolt of MSC's refusal to accept the stowage conditions. *See Flaminia*, 339 F. Supp. 3d at 242 (noting that "[p]roper and adequate performance" of BDP's "document processing duties" was "implicit

5

in [its] agreement" with Stolt). Such notice could have either prevented the voyage altogether or prompted renewed negotiation between MSC and Stolt regarding the conditions of stowage.

In any event, the district court's conclusion was based on the premise that MSC would not have "had different legal responsibilities" if the stowage instructions had been contained in the Sea Waybills. *Id.* at 243. Because that premise is incorrect, I would reverse on this issue.

### III

The district court concluded that the terms of the Sea Waybills required Deltech and Stolt to indemnify MSC, Conti, and NSB for the losses those entities sustained. That was erroneous because the Sea Waybills' indemnification provision is partially unenforceable under the Harter Act, 46 U.S.C. § 30704.

Clause 15.1 of the Sea Waybills provides that when Deltech or Stolt deliver "Goods of a dangerous or hazardous nature" to MSC, Deltech and Stolt need to "fully inform [MSC] in writing of the precise and accurate details of the Goods, and special precautions or handling required for the Goods." *Flaminia*, 339 F. Supp. 3d at 245 (quoting Sea Waybills cl. 15.1). In turn, Clause 15.2 provides that Deltech and Stolt "shall be fully liable for and shall indemnify, hold harmless and defend [MSC] … for all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to [MSC] … arising from such Goods and/or from the breach of clause 15.1, whether or not [MSC] was aware of the nature of such goods." *Id.* at 245-46 (quoting Sea Waybills cl. 15.2). The district court held that, because Deltech and Stolt breached Clause 15.1, the breach triggered the obligation to indemnify MSC, Conti, and NSB under Clause 15.2.

6

The Harter Act provides, in relevant part, that "[a] carrier may not insert into any bill of lading or shipping document a provision avoiding its liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery." 46 U.S.C. § 30704. Clause 15.2 provides MSC with an indemnity against its own negligence and is therefore a "provision avoiding liability for loss or damage arising from negligence." *See Flaminia*, 339 F. Supp. 3d at 245.

In reaching that conclusion, this court's decision in *Gibbs v. United States*, 599 F.2d 36 (2d Cir. 1979), is instructive. In that case, we construed a contractual provision that provided as follows:

> The Contractor shall save harmless and indemnify the Postal Service and its officers, agents, representatives, and employees from all claims, loss, damage, actions, causes of action, expense and/or liability resulting from, brought for, or on account of any personal injury or property damage received or sustained by any person, persons, or property growing out of, occurring, or attributable to any work performed under or related to this contract, regardless of whether such claims, loss, damage, actions, cause[s] of action[], expense and/or liability may be attributable to the fault, failure, or negligence of the Contractor.

*Id.* at 40.

In concluding that this language provided the Postal Service with an indemnity against its own negligence, this court emphasized three textual points that resemble the terms of Clause 15.2. First, the contract required that the contractor "save harmless and indemnify" the Postal Service. That language, this court said, "show[s] an intent to encompass indemnification for the indemnitee's negligence." *Id.*

7

Clause 15.2 similarly provides that Deltech "shall indemnify" MSC and hold it harmless.

Second, the contract in *Gibbs* referred to "all claims" that might arise out of the work performed under the contract. This court observed that this language "on its face" covered claims arising out of the government's negligence. *Id.* Clause 15.2's language is similarly comprehensive, requiring Deltech to indemnify MSC for "all loss, damage, delay, personal injury, death or expenses including fines and penalties, and all reasonable legal expenses and costs caused to" MSC arising from the dangerous goods. *Flaminia*, 339 F. Supp. 3d at 245 (quoting Sea Waybills cl. 15.2).

Third, the contract in *Gibbs* provided for indemnification "regardless of whether" the damage to the government "may be attributable to the fault, failure, or negligence of the Contractor." *Gibbs*, 599 F.2d at 40. While this court did not explain why that language implied that the indemnity extended even to liability arising out of the government's own negligence, the most likely reason is that, by untethering liability from the contractor's fault, the language evinced an intent to provide as broad an indemnity as possible. Clause 15.2 works similarly because it states that MSC is entitled to indemnification regardless of "whether or not the Merchant was aware of the nature" of the dangerous goods. *Flaminia*, 339 F. Supp. 3d at 245-46 (quoting Sea Waybills cl. 15.2). For that reason, Clause 15.2 evinces an intent to give a very broad indemnity that encompasses damages arising from MSC's own negligence.

MSC argues that the Harter Act cannot apply because COGSA is incorporated into the Sea Waybills—a contract—and so displaces the Harter Act. That argument cannot succeed because COGSA applies here only as a matter of contract. Because a contract cannot

8

displace a statute, the Harter Act would govern even if there were a conflict between the two statutes. But there is no conflict: As COGSA itself makes clear, it "shall [not] be construed as superseding … any other law[s] which would be applicable in the absence of this Act, insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. § 30701 note. Because the Harter Act "relate[s] to the duties, responsibilities, and liabilities of the … carrier prior to the time when the goods are loaded on … the ship," COGSA would not displace the Harter Act to the extent it would have governed prior to loading. 46 U.S.C. § 30704; *see also English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard*, 814 F.2d 84, 87 (2d Cir. 1987) (stating that "while COGSA defines a carrier's liability 'from the time when the goods are loaded on to the time when they are discharged from the ship,'" the Harter Act applies before loading and after discharge).

Because the contract's language allows MSC to avoid its "liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery," it is void under the Harter Act to the extent that the indemnity extends to pre-loading and post-discharge conduct. 46 U.S.C. § 30704. Because MSC's principal negligence occurred prior to the loading of the vessel, I would remand for the district court to revisit the allocation of fault. As the district court found, MSC developed its stowage plan on June 28, 2012, days before the ship was loaded. *See Flaminia*, 339 F. Supp. 3d at 204. The stowage plan disregarded the warnings provided in the MBLI. *See id.* at 213. Because the development of the stowage plan occurred prior to loading, the Harter Act prohibits MSC from being indemnified from the consequences to the extent that act was negligent.

9

\*     \*     \*

I agree with the court that the district court erred when it concluded that Deltech and Stolt were liable under a strict liability theory, and I agree that the district court did not err when it concluded (1) that those parties were liable on a negligent-failure-to-warn theory and (2) that Conti, NSB, and NOT were not negligent.

However, the district court did err when it concluded that MSC was not negligent even though it disregarded the instructions on the MBLI. It erred when it held that Stolt could not recover from BDP for breach of contract. And it erred when it concluded that Deltech and Stolt were required to indemnify MSC, Conti, and NSB under Clause 15.2 of the Sea Waybills for MSC's negligent actions performed prior to loading. For those reasons, I dissent in part.